**SECOND DIVISION
ANDREWS, P. J.,
BRANCH and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 16, 2016**

# In the Court of Appeals of Georgia

A15A2226. IN THE INTEREST OF S. C. S., a child.

A15A2227. IN THE INTEREST OF A. W., a child.

BRANCH, Judge.

In these companion cases, the mother of S. C. S. and A. W. appeals from orders of the Juvenile Court of Murray County finding each of the mother's children to be dependent and awarding custody of those children to the Murray County Department of Family and Children Services ("DFACS" or "the Department"). In case number A15A2226, the mother asserts that in finding S. C. S. to be dependent, the juvenile court misstated or mischaracterized the relevant evidence. The mother further contends that a review of the evidence actually presented shows that the State failed to meet its burden of proving S. C. S.'s dependency by clear and convincing evidence.

Finally, the mother argues that the State failed to prove that she was an unfit parent such that removal of S. C. S. from her custody was warranted.

In case number A15A2227, the mother argues that the State failed to prove by clear and convincing evidence either that A. W. was a dependent child or that removal of A. W. from the mother's custody was warranted. The mother also contends that the juvenile court erred when it found that the State had made reasonable efforts to prevent A. W.'s removal from the mother's custody.

For reasons explained more fully below, we find no error by the juvenile court in either case and we therefore affirm the judgment in each case.

*Case No. A15A2226*

The record as to S. C. S. shows that the mother was never married to S. C. S.'s father and that she had sole physical custody of the child at all relevant times.[1] In August or September of 2014, when S. C. S. was approximately 18 to 19 months old, the mother and S. C. S. began living with the mother's boyfriend. Shortly thereafter, in October 2014, the mother and her grandmother got into a physical altercation after the grandmother questioned why there was significant bruising on S. C. S.'s buttocks.

---

[1] Although he was a party to the dependency proceedings in the juvenile court, S. C. S.'s father is not a party to this appeal.

The altercation resulted in the filing of a police report, and the police, in turn, reported S. C. S's injuries to DFACS.

When interviewed by DFACS, the mother stated that she was the individual in charge of disciplining S. C. S. and admitted to spanking the child on his bare bottom. The mother insisted, however, that she had only "popped" the child once with her bare hand. As a result of the incident, DFACS put a safety plan in place, pursuant to which the mother agreed not to use any form of corporal punishment on the child. DFACS also provided the mother with parenting resources, including a referral for training on appropriate parenting and discipline. The Department closed the October 2014 case as to S. C. S. on December 3, 2014.

Two days later, in the early morning hours of December 5, 2014, S. C. S. was admitted to a local hospital with life threatening injuries, including a fractured skull, bleeding on the brain causing a loss of consciousness, and compression fractures of several thoracic vertebrae. In addition to these injuries, S. C. S. also had a recent bruise on the left side of his forehead, near his hairline; a number of "older" bruises across his upper forehead; bruises on his nose; scratches on both ears; bruises on his chest; a significant bruise in the middle of his lower back, near his hips; a bruise on his right shin; a circular bruise around his left ankle; and bruising running down his

left leg, across the top of the left foot, and across the bottom of that foot. Because none of S. C. S.'s injuries appeared to be accidental and because the mother could not adequately explain the cause of those injuries, the hospital referred the case to law enforcement authorities and DFACS.

On December 8, 2014, DFACS applied for and received an order removing S. C. S. from his mother's custody. The juvenile court thereafter held a preliminary protective hearing,[2] after which it entered an order granting DFACS temporary custody of the child pending a hearing on the State's dependency petition, which was filed on December 11. The juvenile court also appointed a guardian ad litem, a special advocate, and an attorney to represent S. C. S. On January 13 and 27, 2015, the juvenile court held the dependency hearing, at which the State presented evidence relating to both the October and the December 2014 DFACS cases involving S. C. S.

As to the injuries sustained by S. C. S. in December, the mother testified that late on the evening of December 4 she left the apartment she shared with her

---

[2] Pursuant to OCGA § 15-11-145 (a), "[i]f an alleged dependent child is removed from his or her home and is not returned home, the preliminary protective hearing shall be held promptly and not later than 72 hours after such child is placed in foster care; provided, however, that if the 72 hour time frame expires on a weekend or legal holiday, the hearing shall be held on the next day which is not a weekend or legal holiday."

boyfriend and S. C. S. and went to her job on the overnight shift at a local convenience store. At that time S. C. S., who the mother left in the care of her boyfriend, was not injured and was asleep in his toddler bed. At approximately 2:30 a.m. on December 5, the mother received a call from the boyfriend, who told her that S. C. S. had awakened crying and that the child was having difficulty breathing. The mother called 911 and then proceeded to her apartment, where she met paramedics and rode with S. C. S. to the hospital. When asked about the origins of her child's injuries, the mother insisted that the boyfriend had not harmed the child. The mother then explained that starting at the age of approximately one year, S. C. S. had begun experiencing "night terrors," during which he would "flail violently" and "thrash[ ] around constantly." The mother therefore believed that either on the night in question or during one night earlier in the week, the child had experienced such a night terror and that he had hit his head on the rail of his toddler bed, thereby fracturing his skull. Additionally, the mother testified that two days before S. C. S. went to the hospital, he had struck his head on the bottom of the kitchen table when he crawled underneath the table to retrieve a ball. When questioned about the bruises on S. C. S.'s forehead, the mother stated that "he always has a bruise on his forehead . . . because he always bumps into everything." The mother also claimed that the severe bruise in the center

of the child's lower back resulted from S. C. S. falling in the tub directly onto his buttocks and that the bruises on his feet (including the top of his foot and the circular bruise around his left ankle) occurred when S. C. S. was playing outside in his bare feet during the first week of December. The mother admitted that she could not explain the bruises on her son's neck and chest at the time he was admitted to the hospital, because to her knowledge no such bruises existed when she left for work the night before.

The boyfriend testified that on the night S. C. S. went to the hospital, he noticed no unusual bruises on the child before the toddler went to bed at approximately 9:00 p.m. After the mother left for work, the boyfriend played video games and heard S. C. S. doing some "whining that he does when he's having trouble sleeping," but the boyfriend did not check on the child, and S. C. S. eventually went to sleep. Several hours later, S. C. S. woke up with a loud cry and when the boyfriend went to check on the toddler, he discovered that S. C. S. was having extreme difficulty breathing. The boyfriend denied hurting the child, but acknowledged that he and the mother were the only two people who had any contact with S. C. S. on the day in question. When questioned, the boyfriend stated that he was aware that the child experienced night terrors, but that he did not hear S. C. S. thrashing in his

toddler bed on the night in question. The boyfriend also admitted that he could offer no explanation as to how S. C. S. might have sustained his injuries.

Brett Morrison was the detective with the Murray County Sheriff's Office who investigated the December incident, and he testified that he had received special training in the investigation of child abuse cases. In Morrison's opinion, the injuries S. C. S. suffered in December 2014 were not accidental. Morrison stated that the occipital skull fracture and retinal hemorrhaging that S. C. S. experienced would have resulted from "an extremely violent impact to or shaking of the child," explaining that it "takes quite a bit of force to cause such injuries." Similarly, the compression fractures to the vertebrae would also require significant force to inflict, and Morrison believed those fractures most likely resulted from the child being physically "slammed down" or falling from a great height. Additionally, Morrison stated that the bruise on S. C. S.'s lower back was also consistent with the child having been slammed down onto his bottom. With respect to S. C. S.'s other bruises, Morrison observed that the bruises on the neck, ankle, and foot were not typical toddler bruises. Finally, Morrison testified that based on his investigation into S. C. S.'s injuries, he did not believe that S. C. S. would be safe if he was returned to his mother's custody.

The State also presented the deposition testimony of Annamaria Church, a pediatrician who consulted on S. C. S.'s case at the hospital. According to Dr. Church, who was qualified as an expert in child abuse cases, "none of the injuries or traumas" suffered by S. C. S. were consistent with the mother's explanations for those injuries. Specifically, Dr. Church stated that neither S. C. S.'s flailing or thrashing around in his bed as a result of night terrors nor his hitting his head on the underside of the kitchen table would explain the skull fracture to the back of the child's head. The doctor described that fracture as "pretty extensive" and requiring "a good amount of force" to inflict, explaining that the skull is "hard[ ] to break." The doctor therefore believed that the skull fracture was an "impact injury," meaning it occurred when S. C. S. was "slammed" into or against something. Additionally, according to Dr. Church, it appeared from the image studies of the child's head that the skull fracture in question was not the first significant injury to S. C. S.'s head, as those studies showed evidence of an earlier injury in that same area of the brain.

Dr. Church further testified that the compression fractures of S. C. S.'s vertebrae were most likely the result of the child being sat down "forcefully . . . smashing him down or onto something hard," and noted that such fractures "usually take[ ] a heck of a lot of force" to inflict. The doctor also stated that the bruise on S.

8

C. S.'s back was not consistent with him falling straight down onto his buttocks in the bathtub, as a bruise resulting from such an incident would have appeared lower down on the back. As to the bruises on S. C. S.'s forehead, Dr. Church testified that there were too many of them for the bruises to be considered accidental. Additionally, the doctor testified that she could not "fathom an accidental means" of a child receiving the bruises that appeared on S. C. S.'s feet and ankle. According to Dr. Church, it appeared that the many bruises over the different parts of S. C. S.'s body were in various stages of healing, and this fact led her to conclude that it was more likely than not that S. C. S.'s injuries had been inflicted over a period of time. Finally, Dr. Church opined that the life-threatening injuries that S. C. S. received in December 2014 could have occurred in only one of two ways. The first possibility was that the boyfriend inflicted those injuries after the mother left for work. Alternatively, either the mother or the boyfriend or both could have injured the child earlier in the day or evening, before the mother went to work, with the child being left unconscious (instead of asleep). Under those circumstances, Dr. Church believed that the report that the child woke up crying showed that the child had regained consciousness at some point. When asked if in her opinion, S. C. S. would be safe if he were returned to his mother's custody, Dr. Church replied "absolutely not."

9

With respect to the October 2014 DFACS case regarding S. C. S., the State introduced photos of the bruises that appeared on S. C. S.'s buttocks at that time. The photos showed five distinct bruises on the child's buttocks, as well as a number of other bruises that were on his buttocks and going up his back. When questioned about the incident, the mother continued to maintain that, despite the number of bruises appearing on S. C. S., she had only given the child one spank with her open hand. The mother also explained her decision to spank the toddler by saying that he had behavior problems, he had a very bad temper, and that on the day in question he had spit at her and attempted to bite her.

After reviewing the October photos of S. C. S.'s buttocks, Dr. Church testified that in her opinion the bruises were "definitely not" consistent with the child having received one swat with an open hand on his bare bottom. Instead, it appeared to her that some of the bruises were inflicted by a hand on several occasions – i.e., the bruises did not result from a single spanking. Additionally, the physician believed that some of the bruises looked as though they resulted from a strap or some other implement.

The State also introduced evidence showing that S. C. S. first began showing visible signs of injury after the mother's boyfriend moved into the residence in

approximately August 2014. Between March and September 2014, S. C. S. was enrolled in a local daycare center. The director of that center testified that beginning in August 2014, a number of bruises began appearing on S. C. S. During that month, daycare workers documented bruises on the child's buttocks, his leg, one of his testicles, and behind one of his ears. When asked about the bruises found on the child's buttocks on August 19, the mother responded that the 18-month-old had received a spanking for refusing to listen to her, and she explained an injury to the child's mouth by saying that he "busted his lip" playing with a toy. When the facility director subsequently contacted the mother to discuss some additional bruises found on S. C. S. the next week, the mother became angry and insisted that the additional bruising occurred when the toddler fell out of bed. On August 27, the mother brought S. C. S. to daycare with a bruise on his forehead and reported to the daycare workers that the child had bumped his head climbing out of his car seat that morning. The record from S. C. S.'s pediatrician, however, showed that the mother had taken the child to the doctor on August 25 for treatment of a bruise on the center of his forehead and bruises on his right ear. The mother told the pediatrician that S. C. S. had sustained those injuries at daycare.

Records from the pediatrician's office also showed that the mother took S. C. S. to the doctor in November 2014 because of more bruising, and on this visit the mother reported for the first time that S. C. S. had behavioral issues, implying that those issues were the cause of his bruises. Notably, however, the daycare director stated that she considered S. C. S. a "normal" two year old with no behavioral problems. Additionally, the DFACS supervisor who oversaw S. C. S.'s case testified that since the child entered foster care upon his release from the hospital in December 2014, the supervisor had received no reports of S. C. S. having any night terrors, behavioral issues, or bruising.

Finally, the State presented the testimony of the boyfriend's ex-wife, who testified as to his violent tendencies. Specifically, the ex-wife testified that while the couple was married, the boyfriend abused her verbally and that after the couple separated, he also became physically violent towards her. The ex-wife explained that she eventually obtained a restraining order against her former husband after he broke into her home and physically assaulted her, set a fire in her yard to burn her personal belongings, threatened her, and generally began behaving erratically. The ex-wife stated that she was afraid of her former husband because he was prone to anger and "goes into a rage" when he "doesn't get what he wants."

The mother acknowledged that the child began suffering significant bruising at or around the time the boyfriend moved into the home. And she further acknowledged that she and the boyfriend were the only two people to have contact with S. C. S. on the day in question. Additionally, the mother maintained that when she put S. C. S. to bed on December 4 the child had no unusual bruising or other injuries. The mother also admitted that she was aware of the opinions of medical and law enforcement authorities that the injuries sustained by S. C. S. were deliberately inflicted on him. Despite all of this evidence, however, the mother testified as to her alleged belief that all of the child's injuries were accidental because S. C. S. is "accident prone." Additionally, even given the objective facts and after hearing the testimony of her boyfriend's ex-wife as to the man's violent tendencies, the mother testified that if custody were returned to her she would have no concerns about allowing the boyfriend to be around S. C. S., as she refused to believe that the boyfriend would injure her child.

Based on the foregoing evidence, the juvenile court entered an order finding that S. C. S. was a victim of physical abuse and was therefore a dependent child. The court further found that returning S. C. S. to his mother would be contrary to the child's welfare and it therefore awarded custody of the child to DFACS. The mother

13

subsequently filed a petition seeking to modify or vacate the dependency order. At the hearing on that petition, the mother presented the testimony of John G. Galaznik, M. D., a pediatrician who had developed a speciality in determining the cause of injuries to infants and small children. Dr. Galaznik had reviewed S. C. S.'s medical records and the available imaging studies of the child's injuries. The physician, however, had not interviewed either the mother, S. C. S.'s treating physicians, or any employee of DFACS.

According to Dr. Galaznik, a skull fracture such as that suffered by S. C. S. could be consistent with a toddler falling and hitting his head in the bathtub[3] and it could also be consistent with a toddler hitting his head on a table. Dr. Galaznik further stated, however, that it was not his job to say whether S. C. S's injuries resulted from abuse. He explained that he was hired based on the assumption that the medical history and explanation of the child's injury given by the parent was true, and that his job was to examine the evidence and see if it could be interpreted to support the parent's version of events. Additionally, Dr. Galaznik stated that it was not his job

---

[3] Notably, when explaining the bruise in the middle of S. C. S.'s back, the mother stated that while in the bathtub, the child had slipped and fallen directly onto his bottom. There was no evidence that S. C. S. had ever hit his head by falling in the bathtub.

14

in this case to form an opinion as to when S. C. S. suffered the injuries in question or whether those injuries were inflicted deliberately. Thus, although the mother claimed that the child had hit his head two or three days before he was taken to the hospital, Dr. Galaznik could not say definitively that S. C. S.'s most serious injuries were that old, and he acknowledged the possibility that those injuries were inflicted on the same night S. C. S. went to the hospital. Nor could Dr. Galaznik rule out physical abuse as a cause of S. C. S.'s injuries. The physician acknowledged that he had no way of knowing whether the mother's explanations as to the cause of S. C. S.'s injuries were true, and he stated that his role in this case was not "to says whether this child was abused or not abused."

Dr. Galaznik further admitted that he would find "suspicious" any assertion that a skull fracture such as that suffered by S. C. S. resulted from a bathtub fall. Moreover, based on his experience, Dr. Galaznik would not expect compression fractures of the vertebrae to result from a child's thrashing around in bed and/or striking the sides of the bed. Finally, Dr. Galaznik acknowledged that many of the bruises on S. C. S., including the circular bruise on the child's ankle, were not in locations where one would expect a child to incur an accidental bruise.

15

Following the hearing at which Dr. Galaznik testified, the juvenile court entered an order denying the mother's petition to vacate or modify the dependency order. The mother then filed this appeal.

Under the most recent version of Georgia's Juvenile Code, the juvenile court may place a minor child in the protective custody of the Department where the State shows, by clear and convincing evidence, that the child is a "dependent child."[4] See

---

[4] The current juvenile code became effective January 1, 2014, and applies to all "juvenile proceedings commenced on or after that date . . . ." Ga. L. 2013, p. 294, § 5-1. The former juvenile code authorized a juvenile court to award custody to the Department of any minor child shown to be "deprived." A "deprived child" was defined as a child who was "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals; [h]a[d] been placed for care or adoption in violation of law; [h]a[d] been abandoned by his or her parents or other legal custodian; or [was] without a parent, guardian or custodian." See former OCGA § 15-11-2 (8). The current juvenile code uses the word "dependent" in lieu of "deprived," and it defines a dependent child as one who "[h]as been abused or neglected and is in need of the protection of the court; . . . [h]as been placed for care or adoption in violation of law; or . . . [i]s without his or her parent, guardian, or legal custodian." OCGA § 15-11-2 (22). The new code defines "neglect" as "[t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals; . . . [t]he failure to provide a child with adequate supervision necessary for such child's well-being; or . . . [t]he abandonment of a child by his or her parent, guardian, or legal custodian." OCGA § 15-11-2 (48). Given the similarities between the definition of a "deprived child" and that of a "dependent child," we find that our previous decisions addressing the deprivation of a child are relevant to appeals involving the dependency of a child.

16

OCGA §§ 15-11-150 (petition alleging dependency), 15-11-152 (contents of petition alleging dependency), 15-11-180 (burden of proof). Thus, on appeal from an order finding a child to be a dependent child, we review the juvenile court's finding of dependency in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent. *In the Interest of A. B.*, 289 Ga. App. 655 (1) (658 SE2d 205) (2008). In making this determination we neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind that "[t]he juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened." Id. at 656 (1) (citation, punctuation and footnote omitted). See also *In the Interest of L. F.*, 275 Ga. App. 247 (620 SE2d 476) (2005).

The State alleged, and the juvenile court found, that S. C. S. was a dependent child because he was a victim of abuse. The code defines abuse, in relevant part, as "[a]ny nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child." OCGA § 15-11-2 (2) (A). On appeal, the

17

mother challenges the juvenile court's finding of dependency on two grounds, and she also challenges the juvenile court's removal of S. C. S. from her custody.

1. The mother contends that the factual findings made by the juvenile court in support of its finding of dependency "misstated or mischaracterized [the] evidence," and that this fact, standing alone, requires us to vacate the dependency order and remand the case for further consideration. See *In the Interest of S. J.*, 270 Ga. App. 598, 610 (1) (c) (607 SE2d 225) (2004) (where a dependency order relies primarily on "misstatements and mischaracterizations of the evidence and unsubstantiated hearsay," the appellate court must, "[a]t a minimum . . . vacate such an order and remand the case for reconsideration") (footnote omitted). We find no merit in this assertion.

(a) The mother identifies three separate factual findings of the juvenile court that she contends were erroneous because they mischaracterized the evidence. Specifically, the mother contends that the trial court erred in finding that S. C. S. had at least 15 bruises on his buttocks in October 2014; that the bruise present on S. C. S.'s testicles in August 2014 was caused by anything other than an allergic reaction to disposable diapers; and that the mother and the boyfriend remained in a relationship. The evidence, however, supports each of these findings.

18

(i) As to the mother's claims of errors regarding S. C. S.'s injuries, the photographs taken in October 2014 of the bruises on S. C. S.'s buttocks and back show that the bruises present at that time were numerous and there could, in fact, be more than 15 bruises. Additionally, the daycare supervisor testified that in August 2014 S. C. S. suffered an allergic reaction to his disposable diapers that resulted in what she described as something akin to diaper rash. The mother informed the daycare of the allergic reaction and the fact that it has caused S. C. S.'s genitals to become "red and swollen" on August 25. The following day, when applying prescription ointment to S. C. S.'s genitals, daycare workers saw a bruise on one of the child's testicles that had not been there the previous day. At the hearing, the mother offered no evidence – either in the form of S. C. S.'s pediatric records or testimony from her expert witness – that a bruised testicle could result from an allergic reaction.

(ii) The evidence also supported the juvenile court's finding that the mother and the boyfriend remained in an "ongoing relationship." Although both the mother and the boyfriend testified that they no longer lived together, the record showed that they had daily contact either in person or via cell phone; that the boyfriend used the mother's car to get to work four to five days a week; that at times the mother drove

19

the boyfriend to and from work while on other days she remained the entire day at the apartment they used to share (and where the boyfriend still resided) while the boyfriend drove himself to and from work.

(b) The mother also points to four specific instances of allegedly erroneous misstatements by the juvenile court which she claims warrant reversing or vacating the finding of dependency. As the mother acknowledges in her brief, however, "[a] misstatement in a finding of fact [contained in a dependency order] is not reversible error unless the appellant can show that the misstatement was harmful." *In the Interest of A. W.*, 264 Ga. App. 705, 708 (3) (592 SE2d 177) (2003) (citation and footnote omitted). And here, the mother has failed to show how any of the juvenile court's erroneous factual findings harmed her.

(i) The mother contends that the juvenile court erred in identifying Dr. Church as one of S. C. S.'s treating physicians, because the record showed that she was simply a consulting physician, brought in "to determine if the injuries [to S. C. S.] were caused by abuse . . . or if they matched the account given by the parents." Whether one characterizes Dr. Church as a treating or a consulting physician, however, is not relevant to her testimony in this case or to the question of whether that testimony supported the conclusion that S. C. S. was abused. Here, the record

20

shows that Dr. Church was qualified as an expert in child abuse cases and in her expert opinion, the injuries S. C. S. suffered were not accidental but instead were inflicted intentionally. In light of this evidence, the mother cannot show she suffered any harm as a result of the juvenile court identifying Dr. Church as one of S. C. S.'s treating physicians, rather than as an expert consultant.

(ii) The mother also asserts that the juvenile court mistakenly found that the October 2014 DFACS case regarding S. C. S. was still ongoing at the time of the December incident. We agree that the record shows that the October case was closed on December 3, 2014, and the second DFACS case was not opened until December 5. The mother fails to explain, however, why the juvenile court's confusion as to the exact date on which DFACS closed its first case should require the juvenile court to reconsider its finding of dependency, especially given that the injuries S. C. S. suffered in December, standing alone, support the juvenile court's finding that S. C. S. was a dependent child.

(iii) The mother further argues that the juvenile court erred in finding that the mother and boyfriend offered inconsistent testimony "regarding the events leading up to" S. C. S. being taken to the hospital. Even assuming that there were no inconsistencies in their testimony, however, the mother cannot show any harm

resulting from this error. Indeed, it is the consistencies in the testimony offered by both the mother and the boyfriend that support the finding that S. C. S. was a victim of abuse at the hands of these individuals. Specifically, both the mother and her boyfriend testified that they were the only two people to have any contact with S. C. S. on the day he was hospitalized and that neither had any knowledge of deliberate injuries being inflicted on the child.

(iv) Finally, the mother argues that the trial court erred in finding that "the mother testified that [S. C. S.] had [no] bruises anywhere on his body" when she left for work on the evening of December 4. The mother points out that during her testimony she acknowledged and offered explanations for the bruises on S. C. S.'s forehead, feet, and back. Again, however, the mother fails to show how the juvenile court's misstatement harmed her. It appears that in this regard, the juvenile court was focused on the mother's testimony that S. C. S. was not suffering from any significant injuries at the time she left for work – i.e, that the mother could offer no plausible explanation for the life-threatening injuries suffered by her child.

2. The mother also argues that the actual evidence of record, when properly characterized, does not support the finding that S. C. S. is a dependent child. In support of this argument, the mother relies on the fact that her expert witness, Dr.

Galzinak, testified that S. C. S's most serious injuries were consistent with the explanations offered by the mother as to the potential accidental causes of those injuries. This argument, however, ignores the testimony of Dr. Church, the sheriff's office investigator, and the DFACS employees, all of which supported the conclusion that S. C. S's injuries were deliberately inflicted and not accidental. To the extent that this evidence was conflicting, we emphasize that as an appellate court, we do not decide what weight should be afforded to specific evidence. See *In the Interest of W. W.*, 308 Ga. App. 407 (707 SE2d 611) (2011). Rather we must affirm the trial court if the record shows that "any rational trier of fact could have found by clear and convincing evidence that the child was [dependent]." Id. (citation and punctuation omitted).

Here, the juvenile court could find that clear and convincing evidence supported the conclusion that S. C. S. suffered significant physical abuse and that the only persons with the opportunity to harm S. C. S. were the mother and her boyfriend. Moreover, despite the mother's testimony as to the other potential causes of S. C. S.'s life threatening injuries, the child had not suffered night terrors, behavioral problems, or significant bruising since being removed from his mother's custody. Given this

23

evidence, and given the juvenile code's definition of a dependent child,[5] the evidence supports the juvenile court's finding that S. C. S. was a dependent child. See *In the Interest of K. B.*, 302 Ga. App. 50, 53 (1) (690 SE2d 627) (2010) (evidence that child suffered physical abuse while in her mother's custody supported juvenile court's finding that child was deprived); *In the Interest of A. R.*, 287 Ga. App. 334, 336 (651 SE2d 467) (2007) (child's "multiple unexplained fractures while in the custody of the mother and father [supported] the juvenile court's finding that [the child] was deprived"); *In the Interest of T. J.*, 273 Ga. App. 547, 549-550 (615 SE2d 613) (2005) (fact that child was brought to hospital with subdural hematoma and multiple fractures supported a finding of deprivation, even though the cause of the injuries remained unknown).[6]

---

[5] As noted above, a dependent child includes one who suffers "[a]ny nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it . . . as the result of the acts or omissions of a person responsible for the care of a child." OCGA § 15-11-2 (2) (A).

[6] These cases also show that to the extent the mother is arguing that the State failed to prove S. C. S.'s dependency because it failed to show that she was the person who inflicted the life threatening injuries on her child, such an argument is without merit. See *In the Interest of K. B.*, 302 Ga. App. at 53 (1); *In the Interest of A. R.*, 287 Ga. App. at 336; *In the the Interest of T. J.*, 273 Ga. App. at 549-550. See also *In the Interest of C. B.*, 308 Ga. App. 158, 162 (3) (706 SE2d 752) (2011) (a parent's decision to expose her child to a dangerous person and subsequent failure to protect the child from that person will support a finding that the child is deprived); *In the Interest of B. H.*, 295 Ga. App. 297, 298 (2) (671 SE2d 303) (2008) ("[i]t is well established that a juvenile court is authorized to find a [child is deprived] based on a parent's failure to protect his or her child from injury") (footnote omitted).

3. As a general rule, a juvenile court may order a dependent child removed from a parent's custody if the evidence shows that the circumstances supporting the finding of dependency "resulted from unfitness on the part of the parent." *In the Interest of C. B.*, 308 Ga. App. 158, 160 (3) (706 SE2d 752) (2011) (citation and punctuation omitted). Specifically, the State must show that the parent engaged in "either intentional or unintentional misconduct resulting in the abuse or neglect of the child," or that the parent is physically or mentally incapable of caring for the child. Id. (citation and punctuation omitted). Relying on this law, the mother argues that even if the evidence supports the juvenile court's finding that S. C. S. is a dependent child, the juvenile court nevertheless erred in removing the child from the mother's custody because the State failed to show that she was an unfit parent. We disagree.

As the evidence set forth above demonstrates, the abuse of S. C. S. can be attributed directly to the intentional misconduct of the mother. Specifically, the evidence shows that either the mother herself inflicted the life threatening injuries on S. C. S. or she allowed the boyfriend the opportunity to inflict those injuries and thereafter worked to shield the boyfriend from prosecution. And the mother's testimony made clear that her priority was protecting her boyfriend, rather than her child. Accordingly, the juvenile court did not err in removing S. C. S. from his

mother's custody. See *In the Interest of C. B.*, 308 Ga. App. at 162 (3) (affirming father's loss of custody where evidence showed that mother posed a danger to the child and the father nevertheless allowed the mother to care for the child, in violation of the safety plan put in place by the Department); *In the Interest of S. Y.*, 284 Ga. App. 218, 219 (644 SE2d 145) (2007) (where evidence showed that one of mother's children had been molested and another had suffered both an unexplained head injury and unexplained sexual abuse, that evidence supported juvenile court's decision to remove all six of the mother's children from her custody).

*Case Number A15A2227*

At the time S. C. S. was taken into DFACS custody in December 2014, the mother was pregnant with the boyfriend's child. At the hearing on the dependency petition as to S. C. S., the mother testified that she had no concerns about the boyfriend's ability to interact with children and that she would allow the boyfriend to help care for their child. Following the birth of that child, A. W., on March 16, 2015, DFACS applied for and received an order placing A. W. in its protective custody pending the filing and adjudication of a dependency petition as to the infant.[7]

---

[7] Both S. C. S. and A. W. were placed with their maternal grandmother and her husband.

26

In its removal order, the juvenile court noted that S. C. S.'s injuries were caused by either the mother or A. W.'s father (the mother's boyfriend) or both and that therefore A. W. would not be safe with either of her parents.

The State subsequently filed a dependency petition as to A. W. and at the hearing thereon, the parties agreed to allow the juvenile court to decide the case based on the record in S. C. S.'s case. The trial court thereafter entered its order finding A. W. to be a dependent child and awarding custody of her to the Department. In Case No. A15A2227, the mother appeals from that order.[8]

4. The mother contends that the juvenile court erred in finding A. W. to be a dependent child because there is no evidence that she had suffered any abuse or neglect. We disagree. Georgia law is clear that

> when it is established that a parent has previously deprived, neglected, or abused one or more of his or her children and that the detrimental conditions existing at that time have not significantly changed, a juvenile court is under no obligation to return a child to [or place a child with] the parent and wait until the child is harmed in order to find that there is evidence of that child's current deprivation.

---

[8] The father of A. W. is not a party to this appeal.

*In the Interest of R. B.*, 322 Ga. App. 421, 424 (745 SE2d 677) (2013) (punctuation and footnote omitted) (holding that finding of infant's deprivation could be based on the evidence leading to the mother's loss of custody of an older child, given that no circumstances had changed between the removal of the older child from the mother's custody and the birth of the infant). See also *In the Interest of A. R.*, 287 Ga. App. at 336 (holding that unexplained injuries suffered by one child supported the juvenile court's order finding that both of the mother's children were deprived, noting that "[a] juvenile court may consider a mother's inability to properly care for one child as evidence that she will not be able to care for her other children") (citation omitted).

Thus, a juvenile court may find a newborn child to be dependent where that child's parent has recently lost custody of an older child as the result of physical abuse suffered by the older child while in the care of that parent. See *In the Interest of K. C. H.*, 257 Ga. App. 529, 530 (571 SE2d 515) (2002). In *K. C. H.*, the mother had previously lost custody of her four-and six-year-old children based on evidence showing that her boyfriend had molested the six-year-old. Id. At the time she lost custody of her children, the mother was pregnant with K. C. H., who was the boyfriend's child. The mother subsequently married the boyfriend, and after she gave birth to K. C. H., the State filed a dependency petition seeking custody of the

newborn. The juvenile court granted the State's petition and placed the child in DFACS custody. Id. at 531. The mother appealed, arguing that under the circumstances, the State could not prove that K. C. H. was deprived, as she had never suffered any harm while in the custody of her parents. Id. We rejected that argument, noting that despite the evidence that her then-boyfriend (now husband) had molested her oldest child, the mother denied that such molestation had occurred, married the man, and continued to live with him. We explained that the deprivation order as to the two older children

> made it clear that the mother's husband posed a threat to her children, and the mother made a choice to allow her newborn child to be exposed to a potentially dangerous predator despite her notice of the danger. The mother's own choices here with respect to K .C. H. show by clear and convincing evidence that K. C. H. was deprived.

Id. at 532 (2).

In this case, the evidence showed that the mother herself posed a threat to A. W., given that it would support the conclusion that the mother herself had physically abused S. C. S. or at least participated in that abuse. Alternatively, the record shows that the mother allowed her boyfriend to abuse S. C. S. With respect to this second possibility, the record further shows that, despite the evidence to the contrary, the

mother denied that the boyfriend had any responsibility for S. C. S.'s injuries; the mother continued to have a relationship with the boyfriend; the mother had no concerns about allowing the boyfriend around her children; and the mother would allow the boyfriend to have unsupervised contact with A. W. Under these circumstances, "the mother's own choices . . . with respect to [A. W.] show by clear and convincing evidence that [A. W.] was [dependent]" based on the mother's unwillingness to protect the child. Id.[9]

---

[9] The mother relies on our decision in *In the Interest of A. B.*, 263 Ga. App. 697, 699 (1) (589 SE2d 264) (2003), to argue that the juvenile court could not rely on the abuse suffered by S. C. S. to find that A. W is a dependent child. This reliance is misplaced. In *A. B.*, the juvenile court granted the State custody of a a newborn based on the mother's loss of custody of her older child. We vacated the order of deprivation, finding that the appellate record did not support the deprivation finding. We noted that the record contained "a mere 15 pages, [was] sketchy at best and [was] replete with hearsay and unsubstantiated statements." 263 Ga. App. at 699 (1). Additionally, the sole witness to testify offered no testimony as to A. B. and stated that she was unsure whether the mother had been aware of the abuse suffered by the older child at the hands of the mother's boyfriend. Id. We therefore concluded that "[a]lthough it may well be that A. B. is a 'deprived child' and that the deprivation is ongoing due to maternal inability to properly care for and protect him, we cannot say that the record before us contains clear and convincing evidence of the statutory elements." Id. (citation omitted). Unlike the record in *A. B.*, however, the record in this case does contain clear and convincing evidence to support the conclusion that if she were placed in her mother's custody, A. W. would be in significant danger of physical abuse.

30

5. The mother also contends that the juvenile court erred in removing A. W. from her custody as the record failed to show that she was an unfit parent. For the reasons set forth in Division 3, supra, we find this argument to be without merit.

6. OCGA § 15-11-202 provides that at a hearing on a dependency petition, the State bears the burden of "demonstrating that . . . [DFACS] has made reasonable efforts to eliminate the need for removal of an alleged dependent child from his or her home." OCGA § 15-11-202 (e) (2) (A). Additionally, in any temporary placement order entered as to a dependent child, the juvenile court must make findings of fact as to whether that child's "continuation in or return to his or her home would be contrary to his or her welfare" and whether "reasonable efforts have been made to prevent or eliminate the need for placement of such child, unless the court has determined that such efforts are not required." OCGA § 15-11-202 (j).

Here, the mother appeals from a temporary placement order in which the juvenile court found that DFACS "made reasonable efforts to prevent or eliminate the need for removal [of A. W.] by attempting to work with the mother in [S. C. S.'s] case," but that those efforts failed as evidenced by the fact that S. C. S. suffered life-threatening injuries while in his mother's custody. The court further found that in light of the record as to S. C. S., A. W. "would be at risk of harm if placed in the

custody of . . . her mother," and that A. W.'s placement with the mother would be "contrary to the welfare of the child." The mother claims that these findings are insufficient to support the removal of A. W. from the mother's custody as they fail to show that the Department made any effort – reasonable or otherwise – to eliminate the need to remove A. W. from the mother's home. This argument provides no basis for reversal.

Even where the record fails to show that the Department made reasonable efforts to prevent removal of the child, that fact "shall not preclude the entry of an order" placing a dependent child in the custody of DFACS "when the court finds that [such] placement is necessary for the protection of such child." OCGA § 15-11-202 (g). Here, the juvenile court specifically found that placement of A. W. in the Department's custody was necessary for A. W.'s protection, as both of her parents posed a danger to the infant. Thus, even assuming that DFACS made no reasonable effort to prevent A. W.'s removal from her mother's custody, the juvenile court's factual findings support the award of custody to the Department.

For the reasons set forth above, we affirm the order of the juvenile court entered in Case No. A15A2226, finding S. C. S. to be a dependent child and granting custody of that child to the Department. We also affirm the order of the juvenile court

32

entered in Case No. A15A2227, finding A. W. to be a dependent child and granting custody of that child to the Department.

*Judgments affirmed. Andrews, P. J., and Peterson, J., concur*.