**September 11, 2025**

# In the Court of Appeals of Georgia

A25A1235. IN THE INTEREST OF S. H., a child.

DOYLE, Presiding Judge.

In this ongoing dependency proceeding, minor child S. H. appeals from a permanency hearing order[1] denying his motion for unsupervised visitation with his mother ("the Mother"). Specifically, S. H. contends that the record does not support the juvenile court's conclusion that unsupervised visitation was not in his best interest, in light of the rebuttable statutory presumption in favor of unsupervised

---

[1] See generally OCGA § 15-11-230 (c) ("After the initial permanency plan hearing has occurred, a permanency plan hearing shall be held not less frequently than every six months during the time a child adjudicated as a dependent child continues in DFCS custody. . . .").

visitation in this context.[2] The appellee, the Department of Human Services ("the Department"), agrees that the juvenile court erred, and for the reasons that follow, we vacate the denial of unsupervised visitation and remand for an evaluation of current conditions relevant to determining the present need for supervision, if any, during the Mother's visitation with S. H.

"In appeals from orders in a dependency case, we construe the evidence in the light most favorable to the juvenile court's findings."[3] So viewed, the record shows that S. H. (born in February 2012, and now 13 years old) is the oldest of the Mother's six children. In April 2022, the Chatham County Department of Family and Children Services ("DFCS") filed a dependency petition with respect to the oldest five children, who at the time ranged in age from ten years old (S. H.) to six months old (D. G.).[4] At the time of the underlying petition, DFCS determined that six-month-old D. G. had unexplained rib fractures and chronic bruising "consistent with non-

---

[2] See OCGA § 15-11-112 (b) ("There shall be a presumption that visitation shall be unsupervised unless the court finds that unsupervised visitation is not in a child's best interests.").

[3] *In the Interest of B. R.*, 368 Ga. App. 353, 354 (890 SE2d 129) (2023).

[4] The sixth child, T. G., was not yet born but was taken into DFCS custody soon after birth.

accidental trauma," and the Mother allegedly was the sole caregiver. Based on D. G.'s condition, the Mother's failure to meet her medical and nutritional needs, and the Mother's lack of stable housing, DFCS was awarded temporary legal custody of the five children. The Mother later consented to the termination of her parental rights as to D. G.[5]

The Mother was arrested based on her suspected involvement in abusing D. G., but she later disclosed that the child's father[6] (the Mother's husband) had been present as a caregiver before he became incarcerated , and the charges against her eventually were dismissed. DFCS crafted a plan to pursue reunification and termination of the Mother's parental rights concurrently. The Mother was allowed regular supervised visitation with the children, which generally went well, and the children seemed to enjoy seeing the Mother.[7] Also, in accordance with her case plan,

---

[5] At the present time, five children are the subject of this deprivation proceeding.

[6] S. H. has a different father from the other four children. Neither father has participated in these proceedings.

[7] One interim permanency order noted that the Mother spanked a child on one occasion, which was addressed by a service provider to the Mother. Subsequent orders did not note any problems.

the Mother completed a child and family assessment, psychological evaluation, domestic violence assessment, parental education class, and individual counseling.

In August 2023, the Mother gave birth to T. G., who had respiratory issues making him vulnerable to infections and other breathing difficulties. In January and August 2024, the juvenile court entered further orders following regular permanency hearings. Among the findings were that the Mother had been untruthful about her ongoing contact with the father (and alleged abuser) of D. G., but that she was making progress toward seeking a divorce from him. DFCS and other service providers were made aware of her lack of candor. The Mother's participation in supervised visitation continued with positive feedback from the supervisors. Based on her progress, and at DFCS's recommendation, the juvenile court granted the Mother unsupervised daytime visitation limited to public locations, such as parks, arcades, or shopping centers, with at least five members of the public present.

In December 2024, following a regular hearing in October, the juvenile court entered the order subject to this appeal. In that order, the juvenile court noted that the Mother had obtained employment, but that the counseling that the Mother had received earlier in the case plan was provided by a counselor, Patrice Frazier, who was

new to the field. Noting Frazier's lack of specific training in domestic violence,[8] the fact that the Mother had concealed her ongoing relationship with D. G.'s father, and DFCS's failure to provide Frazier with certain records, including police reports and domestic violence assessments, the juvenile court found that Frazier "was not fully aware of the reasons the Children were . . . in need of the protection of the Court and removed from the Mother's home." Therefore, the court concluded, "while the Mother has participated and engaged in the services referred by DFCS, such services have been inadequate to meet the particularized needs of the [M]other and were not appropriately tailored to address the ongoing causes of the Children's dependency."

The juvenile court came to a similar conclusion with respect to the children's counselor, Aisha Prater, noting that DFCS had not given her full information about the Mother's contact with D. G.'s father, T. G.'s health issues, and D. G.'s injuries.

With respect to visitation, the juvenile court noted that the Mother had visited with the children in the community twice per week, but it found that "following such visits, the Children were returned to their foster homes appearing dirty and wet, including their clothing and shoes." On one occasion, T. G. was returned "with only

---

[8] The juvenile court did accept Frazier as an expert in "licensed professional counseling."

5

a diaper on and hair full of sand," and he needed treatment with his nebulizer "for a few days after each visit despite [T. G.] no longer needing such treatments at any other time." The court found that the Mother was not adequately responsive when a CASA[9] caseworker attempted to reach her regarding T. G.'s breathing issues.

Based on Frazier's lack of qualifications and both her and Prater's lack of full knowledge of the case,[10] the juvenile court elected to give no weight to their recommendations to expand daytime visitation to unsupervised. The court found that "[DFCS] failed to comply with the permanency plan for the Children," and "while the [M]other has demonstrated attempted compliance with certain aspects of the case plan, the inadequate services referred by [DFCS] have resulted in a lack of progress toward reunification." Based on these findings, the juvenile court concluded:

> Unsupervised visitation is not in the best interest of the children as the [M]other has demonstrated a lack of protective capacity by being untruthful about contact with [D. G.'s] father during the course of these dependency proceedings as well as by failing to promptly provide all information to investigating authorities at the time the sibling [was

---

[9] "CASA" refers to the court appointed special advocate.

[10] The juvenile court also found that the children's counselor was uninformed about relevant aspects of the case, such as T. G.'s health issues and the allegation of abuse leading to the Mother's arrest.

injured], as well as by returning the Children in an unkempt state at the conclusion of prior visitations and by returning [T. G.] from prior visitations in a condition that has required [him] to need nebulizer treatments.

S. H. now appeals from this order, contending that the record fails to support a conclusion that the presumption of unsupervised visitation has been overcome at this stage in the proceeding as to him. We agree.

OCGA § 15-11-112 provides:

(a) When a child is removed from his or her home, the court shall order reasonable visitation that is consistent with the age and developmental needs of a child if the court finds that it is in a child's best interests. The court's order shall specify the frequency, duration, and terms of visitation including whether or not visitation shall be supervised or unsupervised.

(b) *There shall be a presumption that visitation shall be unsupervised unless the court finds that unsupervised visitation is not in a child's best interests.*[11]

---

[11] (Emphasis supplied.)

In the context of dependency proceedings, a finding of dependency must be supported by clear and convincing evidence.[12]

As noted above, the juvenile court's ruling was premised primarily on the inadequacy of services provided by DFCS and the children's condition after returning from visitation with the Mother. It stated:

> In light of the Court now learning that the [earlier] recommendation . . . from the [M]other's therapeutic provider was inadequately informed, the children returning from visitations in unkempt physical conditions, [T. G.] returning from visitations with exacerbated health conditions, and the Court now learning that the family has not been receiving appropriate services tailored to the causes of dependency, the Court finds the presumption in favor of unsupervised visitation to be rebutted.

The findings regarding visitation were based in large part on a CASA report. According to the report, the foster parents stated "that the children come back from visitation dirty and wet, including their clothing and shoes. . . . [T. G.] came home once with only a diaper on and hair full of sand. . . The children said they spend most

---

[12] See *In the Interest of K. M.*, 370 Ga. App. 390, 393-394 (897 SE2d 521) (2024) (stating the standard of review); *In the Interest of K. K.*, 364 Ga. App. 82, 83-84 (874 SE2d 110) (2022) (specific findings supported by clear and convincing evidence must be memorialized in the order).

of their [visitation] time in the park. [T. G.] is permitted to crawl around on the grass [despite concerns regarding his breathing issues]."

On appeal, S. H. correctly points out that the focus on T. G.'s health, who was two years old and suffered a chronic breathing condition, was not an adequate basis to restrict the Mother's visitation with respect to S. H. While concern for T. G.'s health certainly justifies supervision as to visitation with T. G., without more, it does not demonstrate how visiting with the Mother would not be in the best interest of S. H., who was an eleven year old in normal health at the time of the hearing,[13] and who had expressed a desire for unsupervised visitation with his Mother.[14]

As a general matter, for the state to intervene in the parent-child relationship through a dependency proceeding based on parental unfitness, the dependency of the

---

[13] S. H. turned 12 between the October 2024 hearing and the December 2024 order. Compare with *In the Interest of S. C. S.*, 336 Ga. App. 236, 249-251 (4) (784 SE2d 83) (2016) (collecting cases in which this Court has found that evidence of inability to provide appropriate care to older children can be evidence of inability to provide appropriate care to younger children if the circumstances leading to the previous finding persist).

[14] As noted below, nothing herein restricts the juvenile court's evaluation and fact finding with respect to the conditions present upon remand.

child must be "due to lack of proper parental care or control by his or her parent,"[15] so there must be a causal link between the parent's conduct and the child's condition.[16] Specifically, in a preliminary protective proceeding, the juvenile court must make findings as to why the removal is contrary to the child's welfare or in his best interests.[17] The juvenile court's order concluded that S. H.'s best interest was not served, but noting T. G.'s health condition does not ground this conclusion in evidence pertaining to S. H. Absent a connection to the Mother's supervision of S. H., T. G.'s need for a nebulizer after outdoor visits with the Mother does not support the conclusion that unsupervised visits are not in S. H.'s best interest. This is not to say that poor parenting of one child cannot evince a lack of fitness impacting another child. But the bare findings with respect to T. G. here do not support a conclusion as to S. H. due to their differences in age and health. T. G.'s condition after the benign

---

[15] OCGA § 15-11-310 (a) (5).

[16] See generally id. at (A) and (B) (establishing as grounds for termination that returning the child or continuing the parental relationship "is likely to cause" harm to the child).

[17] OCGA § 15-11-146 (c).

activity of outdoor visitation does not demonstrate a lack of ability on the part of the Mother to independently supervise S. H. during a discrete temporary visit.[18]

Further, testimony from the permanency hearing, including that of CASA case workers, shows that the report of the children's condition after visitation was based in part on the fact that the children were wet after the Mother took them to a park and the children played in sprinklers. A case worker clarified that the wet clothes were "not something caused by neglect or abuse." The case worker had viewed photos of the children during that visit and stated that the children looked "well kept" during that visit.[19] Further, the Mother was required to visit with the children in a public place, and as pointed out by the case worker at the hearing, an outdoor park is an appropriate place for such visits. Even in the best of circumstances, children who play at a park often get dirty and need cleaning upon returning home, and nothing in the hearing evidence suggested that the children were dirty due to improper parenting by

---

[18] See *In the Interest of T. Y.*, 357 Ga. App. 189, 198 (1) (850 SE2d 244) (2020) (reviewing a dependency order and explaining that "[w]hile it is not the duty of this Court to weigh the evidence or determine the credibility of witnesses, when appellate standards are not met, we cannot affirm the juvenile court's decision").

[19] Similarly, there was additional testimony that on another occasion the Mother addressed two of the children's unkempt hair by taking one to get a haircut and taking another to get her hair braided.

the Mother, who was not allowed to take them home for cleaning and dressing. As stated above, any special concerns regarding the Mother's decision to allow two-year-old T. G. to crawl in the grass do not bear on her ability to visit unsupervised with S. H. Therefore, the adverse facts in the CASA report, which were largely rebutted and explained by evidence at the hearing, do not support a finding by clear and convincing evidence that unsupervised visitation would not be in S. H.'s best interest.[20]

Last, with respect to the inadequacy of the interventions provided by DFCS, the juvenile court focused on the counselors' lack of specific qualifications with respect to domestic abuse; their lack of awareness of T. G.'s health concerns; the alleged abuse of D. G.; the Mother's apparent hesitance to inculpate and divorce the father; and DFCS's failure to make recent unannounced visits to the Mother's home. The court's order, however, noted that the Mother's counselor knew that "something happened" to D. G., that she was "abused or something like that," and that there had been domestic violence between the Mother and father. Similarly, the children's counselor stated at the hearing that she was aware that the children "were exposed to

---

[20] Cf. *In the Interest of M. S.*, 352 Ga. App. 249, 258 (834 SE2d 343) (2019) (reversing trial court's dependency order because the juvenile court's findings were not supported by clear and convincing evidence; specifically, the court's findings regarding drug abuse were rebutted by other record evidence).

abuse and neglect and domestic violence," but she did not find out about D. G.'s abuse until a few months before the October 2024 hearing.[21] There was a stipulation that the Mother's counselor was later made aware of the Mother's lack of full disclosure with respect to her prior contact with the father and that counseling with the Mother was ongoing. Therefore, even if the Mother's counselor was not fully informed of all of the circumstances, she was made aware of the circumstances as counseling continued. In sum, with respect to D. G.'s history and T. G.'s health concerns, there were no findings as to how these matters would impact visitation with S. H., and the Mother had a track record of visitation with the children with no reports of issues involving S. H.[22]

We defer to the trial court's skepticism of the counselors' qualifications and prior knowledge of the case history, but there was no finding made with respect to how changing the existing public-only visitation with S. H. would be impacted by the lack of service that the court sought to remedy. None of the adverse findings made by the juvenile court related to S. H., who did not have the same history and needs as D.

---

[21] An August 2024 order noted that the service providers had been made aware of the Mother's lack of candor regarding her contact with the father.

[22] See id.

G. or T. G.[23] The statutory scheme establishes a presumption that unsupervised visitation is in the best interest of children, and so far in this case, the only problematic aspect of visitation was the children getting dirty while playing at a park (which is not a major cause for concern) and T. G.'s breathing difficulties (which does not pertain to S. H.'s care). Based on this record, we agree with the parties in this appeal that the record failed to support by clear and convincing evidence a finding that unsupervised visitation was not in S. H.'s best interest.[24]

Accordingly, we vacate the juvenile court's order with respect to visitation of S. H., and we remand for the juvenile court to hold a hearing to determine whether the current conditions and case history warrant some form of unsupervised visitation

---

[23] At the hearing, Frazier testified that she had observed the Mother "practicing the skills," and S. H. "is pretty good at listening to his mother and following directions." There was other testimony by a child therapist, whom the court did not accept as an expert, that S. H. earlier displayed "outbursts" when he was not given an adequate explanation about why he was in trouble.

[24] The record does not demonstrate that S. H.'s father would be present if S. H. were to spend unsupervised time at the Mother's home. See, e.g., *In the Interest of M. S.*, 352 Ga. App. at 260-261 (holding that the trial court's finding that domestic violence may occur in the future was speculative and unsupported by evidence that the mother intended to live with the father). To the extent that S. H.'s father would be involved, the juvenile court may consider that as a factor in allowing unsupervised visitation.

between S. H. and the Mother.[25] Our holding does not constrain the juvenile court's determination of that issue, based on the hearing evidence, including whether visitation is overnight or only daytime.

*Judgment vacated and case remanded with direction. Markle and Padgett, JJ., concur.*

---

[25] Cf. *In the Interest of D. T. A.*, 312 Ga. App. 26, 33-34 (1) (d) (717 SE2d 536) (2011) (vacating a juvenile court's termination order and remanding the case for the court to make appropriate findings of fact and conclusions of law to support its judgment).