**THIRD DIVISION
DILLARD, P. J.,
GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**October 11, 2019**

# In the Court of Appeals of Georgia

A19A1273. IN THE INTEREST OF M. S., a child.

GOBEIL, Judge.

Jessica Flood, the mother of M. S., appeals from the Whitfield County Juvenile Court's order finding M. S. dependent as to both parents[1] and awarding temporary custody to M. S.'s paternal grandparents. In her sole enumeration of error, Flood argues that the dependency finding was not supported by clear and convincing evidence. For the reasons explained below, we agree and reverse.

The record shows that on September 14, 2018, the Whitfield County Department of Family and Children Services ("the Department"), filed a dependency petition, alleging that M. S. (then 1 year old) was a dependent child in need of the State's protection for the following reasons: (1) Flood had other children that were

---

[1] The father is not a party to this appeal.

currently in foster care; (2) M. S.'s legal father, Justin Flood, was incarcerated, and the location of M. S.'s putative biological father, Jeremy ("Jeremy"), was unknown; (3) on August 2, 2018, a drug screening of Flood's hair follicle was positive for methamphetamine, cocaine, and benzodiazepine; (4) there were ongoing concerns about the condition of Flood's home, which was "extremely nasty"; (5) Flood was recently evicted and was uncertain of where she would be living; (6) Flood had a temporary protective order ("TPO") against Jeremy due to domestic violence; and (7) M. S. was previously "safety planned" to her paternal grandparents, Andrea and Michael White, both of whom had been involved with M. S. her entire life, and were approved by the Department for placement and willing to assume custody of M. S. Accordingly, the Department requested that custody of M. S. be vested with the paternal grandparents and that a guardian ad litem ("GAL") be appointed. The juvenile court subsequently appointed a GAL for M. S.

Two months later, a hearing on the dependency petition was held on November 29, 2018. The Department called Jeremy, M. S.'s case manager, and M. S.'s paternal grandmother as witnesses. Jennifer King, a case manager with the Department, testified that she became involved with M. S. on August 14, 2018, after the Department received a report from a foster care case manager that "there were

2

concerns for the home conditions and [that] the mother had tested positive [for drugs] on her hair follicle." Specifically, a drug screening of Flood's hair follicle in August 2018 tested positive for methamphetamine, cocaine, and benzodiazepine. A repeat screening on October 2, 2018, tested positive for benzodiazepine and cocaine, but at a lower level.[2] King admitted that the Department had not conducted any further hair follicle or urine drug screenings of Flood since October 2, 2018.

King also testified that Flood had "a lengthy history" with the Department which she reviewed as part of her investigation, and that, at the time of her investigation, there was a pending proceeding to terminate Flood's parental rights to another child.[3] King testified that she also reviewed the allegations in the TPO with Flood, and Flood confirmed that all of the allegations were true and that she was "fearful" of Jeremy.

As part of her investigation, King performed a walk-through of Flood's apartment. King observed that the apartment was cluttered, there was no bed for M.

---

[2] The Department tendered and the court admitted the drug screening results as exhibits P-3 and P-4, but they are not in the record on appeal.

[3] However, King did not provide any further details about Flood's "history" with the Department and no records or other evidence related to said history were submitted into evidence.

S. (Flood indicated that she had been sleeping on the couch with M. S.), "[t]here wasn't a whole lot of food in the home, and the kitchen was pretty messy with dishes and food . . . [and King's] feet [stuck] to the floor." King indicated that M. S. was crawling on the sticky floor, and that there was an odor coming from the apartment, but she did not describe the odor. When King questioned Flood about the condition of the apartment, Flood indicated that she had not cleaned because "she had been working." Flood denied that she was being evicted, and indicated that the action had been dropped based on an agreement she reached with her landlord to pay extra money each week until she "caught up" on the rent. However, King spoke with Flood's landlord and the landlord denied having any payment arrangement with Flood. King informed Flood that the action had not been dropped and that Flood was going to be evicted. Because Flood was being evicted and had nowhere to go with M. S., King requested legal custody of M. S. on behalf of the Department, but the request was denied.[4] As an alternative, the Department safety planned M. S. to Jeremy's parents on August 14, 2018. King testified that M. S. already had a relationship with the Whites, as "[t]hey had kept her several times for long periods." King indicated

---

[4] The record in this case is only 28 pages long and does not include any prior legal requests filed by the Department.

that the Department was requesting that legal custody of M. S. be transferred to the Whites.

On cross-examination, King acknowledged that, a few weeks after being evicted, Flood obtained a new apartment around September 18, 2018. A walkthrough of the new apartment revealed that it met Department standards. Specifically, "[i]t was clean and furnished[, including a baby bed,] and had some safety devices in place." When asked why the Department wanted to place M. S. with her paternal grandparents, even though Flood had obtained a stable home and had a job, King stated, without further elaboration, that the Department's "concern [was] that [Flood] has failed to maintain housing for long periods of time."

M. S.'s putative biological father, Jeremy,[5] testified that he was 25 years old, M. S. was his only child, and he had never been married. He explained that he and Flood lived together until she obtained a TPO against him in July 2018, although she subsequently voluntarily dismissed the TPO. With regard to the allegations in the TPO, Jeremy admitted that he had pushed Flood; broken several of her cell phones;

---

[5] It was established at the beginning of the dependency hearing that a DNA test confirmed that Jeremy was M. S.'s biological father, but no legitimation had yet occurred. Until the legitimation takes place, Justin Flood, who was not present at the hearing, is still M. S.'s legal father.

taken her backpack and prevented her from getting it back; punched walls; held her down; locked her in the house so she could not leave because he was trying to talk to her; got angry when he was driving and tried to scare her; and attempted suicide by hanging in front of her to scare her. However, he denied that he had ever been physically violent; threatened her with a knife; pushed her down the stairs; choked her; pulled her hair; punched holes in the walls; or threatened to drive their car off of a mountain with her in it. Jeremy stated that Flood was never violent towards him and never hit, pushed, or threatened him. He and Flood separated in mid-July 2018, "right before" she obtained the TPO. He explained that since the dismissal of the TPO, the two remained friends. When asked about whether he would consider reconciliation, Jeremy stated "if it happens, it happens. If it don't, it don't." Jeremy maintained that his friendship with Flood was "good" and that they currently did not argue or fight. He explained that since he and Flood separated in mid-July, he had been living with various friends and traveling around the country on his friend's motorcycle. He currently lived with a friend in the apartment next door to Flood, and had been there for approximately one month. He indicated that he had plans to get his own residence, although he did not have a set timeline for doing so. He worked for Wood Hollow

6

Cabinets, and had been employed there for approximately two months. He indicated that he was making approximately $300 to $500 a week.

Jeremy admitted that he had not been paying his parents any support even though M. S. had been in their custody for the last few months. However, on at least one occasion while M. S. was in his parents' custody, he bought some baby wipes and an outfit for her. Jeremy maintained that he told his parents to let him know "if they needed anything" for M. S., but they had not asked him to help with anything. He visited with M. S. every other Saturday at his parents' home. Jeremy testified that he planned to continue being a part of M. S.'s life, to pursue legitimation, and that he wanted to do what was in M. S.'s best interest. Jeremy stated that he believed it was in M. S.'s best interest to be with Flood.

The Department noted that Jeremy submitted to a urine and hair follicle drug screening in October 2018. The urine test was positive for marijuana, and the hair follicle test was positive for methamphetamines and morphine. Jeremy denied knowing that his test was positive for morphine and denied using morphine. He asserted that the last time he used methamphetamines was over a "year ago." Jeremy denied that Flood used methamphetamines or any drugs at all.

Andrea White ("Andrea"), M. S.'s paternal grandmother, testified that M. S. was born June 15, 2017, and she had been very involved in M. S.'s life from birth. She first starting keeping M. S. when she was approximately nine days old, and kept her at least every weekend because it was important to Andrea and Michael that M. S. go to church. However, they would drop M. S. off at Flood's and Jeremy's home either Sunday night or on Monday. Andrea testified that beginning in January 2018, they started keeping M. S. for longer periods of time, sometimes keeping her for two or three weeks without any contact with either Flood or Jeremy. Andrea did not elaborate as to how often these multi-week stays occurred. Rather, she stated that generally Flood would drop M. S. off on Friday, the Whites would keep her through the weekend, and Flood would pick her up on Monday. When asked whether they had the child more than Flood, Andrea stated it was as if they shared "joint custody" of M. S.

Andrea further testified that she had concerns about her son's relationship with Flood because he had anger issues, and he and Flood seemed to argue a lot. Additionally, Flood told her that Jeremy had broken several of Flood's phones, and sometimes would prevent Flood from leaving the house after an argument. Andrea confirmed that she was bonded with M. S. and she and her husband were willing to

care for M. S. until one or both of M. S.'s parents were stable. When asked about whether she had "any concerns about drug use," Andrea testified that she knew her son used marijuana. She did not express any drug use concerns with regard to Flood.

Andrea confirmed that she had visited Flood's old apartment. When asked whether she had "any concerns about the cleanliness or neatness of the home," Andrea stated that "[t]he only thing that I honestly noticed was the spare bedroom had a very bad like cat urine smell." However, she explained that Flood and Jeremy did not have a cat although they had a dog at one time, and had tried using air fresheners and deodorizers to help with the smell. She testified that in her opinion, Flood's and Jeremy's old apartment was "not unsafe," but noted that they "never had a lot of food in [the] home."

On cross-examination, Andrea testified that she recently asked both Flood and Jeremy if they would buy diapers and wipes for M. S., and that Jeremy bought some baby wipes and an outfit. She also stated that Jeremy told her that he was the one that did most of the care taking of M. S. when he and Flood were together. However, Andrea confirmed that she had not personally witnessed this, and that most of her interactions with Flood and Jeremy were at "a pick-up or a drop-off, . . . [s]o there wasn't a whole lot of witnessing who was doing what." Andrea confirmed that since

9

M. S. had been placed with them, there had been no change in her. Rather, M. S. was "just like she always was, quite happy, pleasant."

After the Department rested its case, Flood moved to dismiss the dependency petition, arguing that the Department failed to meet its burden of showing that M. S. would be dependent if returned to her custody in light of the fact that the Department admitted the mother's current apartment was adequate, she had a job and stable income, visited with M. S. regularly, and the Department had not conducted a recent drug screening. Jeremy also joined in Flood's motion. The court denied the motion, noting that "[i]t is [a] fairly close" call, but that the court was concerned about many of the domestic violence allegations in the TPO, and the fact that Flood and Jeremy were now living next door to each other and had not demonstrated any resolution of the difficulties in their relationship.

Flood testified that she had custody of M. S. from her birth in June 2017 until August 2018. She explained that she moved into her new apartment on August 31, 2018, (a couple of weeks after being evicted), and the new apartment has two bedrooms, one of which is a room for M. S. Flood confirmed that she had a baby bed and clothes for M. S., and food in the home. Flood indicated that she works full-time for WalMart from 1:00 to 10:00 p.m., and makes $11.00 an hour. If M. S. was

10

returned to her custody, Flood stated that she would put M. S. in daycare, and that Flood's mom (who lives in the same apartment complex as Flood) could watch M. S. for the few hours between when the daycare closed and when Flood got off work. Flood stated that she has a driver's license and a vehicle, that there was nothing "lacking" in her home for M. S., and that she wanted custody of M. S. returned to her.

Flood tendered without objection results from three separate hair follicle drug screenings completed on August 27, 2018, October 8, 2018, and November 5, 2018, respectively, which Flood voluntarily paid out of pocket to have completed by an independent laboratory.[6] The results for all three hair follicle screenings were negative for any drugs. Flood denied ever using any drugs, and indicated that she would be willing to take a urine test for the court immediately, if requested. Flood stated that she visited with M. S. regularly, and took diapers and wipes to the paternal grandparents when they asked her to do so.

On cross-examination, Flood acknowledged that in the three months since M. S. was safety planned to the Whites, she had not paid them any child support, but would have if they had asked her to do so. The Department then questioned Flood

---

[6] Although these were admitted into evidence as Exhibits M-1, M-2, and M-3, they are not in the record on appeal.

11

about her plan for her mother to watch M. S. after the daycare closes, noting that the Department "would not approve" her mother as a caregiver. Flood expressed surprise, and stated that the last time that the Department "even looked at my mother was two years ago." The Department pointed out that Flood herself had been in foster care, but Flood stated that was over 19 years ago, and although her mother was at one time an alcoholic, she had completely stopped drinking in the past few months. Flood confirmed that she did not use alcohol herself.

With regard to the TPO, Flood maintained that all of the allegations against Jeremy were true. Nevertheless, she contended that, although their romantic relationship was "toxic," they had a "great" friendship and she was not afraid of Jeremy anymore. She explained that she dropped the TPO because after they ended their relationship, Jeremy moved out and there was no need for the TPO. Flood maintained that M. S. was never present for any of their arguments and that she would always send her to the grandparents' home when there was conflict. Flood testified that she did not depend on Jeremy for any type of support and could provide for M. S. without any assistance from him. Flood then rested her case, and renewed her motion to dismiss the petition.

The Department opposed the motion, emphasizing Flood's positive drug screenings, that she had a "long history" of instability and failed relationships and a demonstrated inability to parent, had lied to the court in the past, and had "zero credibility." The Department emphasized that the evidence established that Jeremy provided most of the care for M. S. when Flood had custody of her, and the Department had "severe concerns" about M. S.'s safety if she were returned to Flood's custody.

In response, Flood's counsel argued that there was no present drug issue as evidenced by the three negative hair follicle screenings that Flood voluntarily submitted to, using one of the same vendors as the Department. He also emphasized that the Department had not completed a drug screening on Flood since October 2018, and the most recent one submitted to by Flood in November 2018 was negative. Further, counsel emphasized that Flood and Jeremy no longer live together, and, thus, there was no reason to think that M. S. would be in any danger in Flood's custody. Accordingly, counsel argued that M. S. was not dependent as of the date of the hearing.

The GAL stated that he agreed with the Department regarding Flood's credibility, but that he also agreed with Flood's counsel "regarding many of the issues

of current dependency as far as housing and job and that type of thing." The GAL acknowledged that this case was "a very close call," but that he believed M. S. was dependent because Flood relied "extensively" on the paternal grandmother to help care for the child. Thus, the GAL had concerns about returning M. S. "carte blanche" to Flood's care, and he believed it was in M. S.'s best interest to remain in the custody of the Whites. The GAL also expressed his opinion that he believed that a case plan and some services to assist Flood should be put into place. The Department stated that Flood had already received a case plan and "extensive services" in the past related to her other children. Thus, given Flood's history, in the Department's opinion, it was best for custody of M. S. to be vested in the paternal grandparents. The court denied Flood's motion to dismiss the petition.

Both the Department and Flood waived closing arguments. The GAL recommended that M. S. be found dependent as to both parents, and that the Whites be given custody. The court announced its finding that M. S. was dependent as to both parents and that it was in her best interest to be in the custody of her paternal grandparents.

Following the hearing, the juvenile court entered an order finding M. S. dependent, concluding that she had been abused and/or neglected within the meaning

14

of OCGA § 15-11-2 (22). The court indicated that M. S. was dependent due to the following conditions: (1) the mother had an "extensive history" with the Department, as well as a history of unstable income and housing, and had other children in foster care; (2) there were ongoing concerns about the dirty condition of the mother's home; (3) the mother tested positive on two Department drug screenings (although the court acknowledged this evidence was controverted because the mother also produced several negative drug screenings); (4) the mother and father had a history of domestic violence, resulting in the mother obtaining a TPO against the father, which she later dismissed, and, yet despite their volatile history, they lived next door to each other; (5) the paternal grandmother testified that she kept M. S. on numerous occasions and for long periods of time; and (6) Flood had no plan for daycare other than her own mother who had not been approved by the Department and had a history of alcohol issues. The court also went on to find that the Department had made reasonable efforts to eliminate the need for removal of the child and for reunification, and noted that Flood has two older children that had been removed from her care and for which termination is pending. Accordingly, the court found that returning M. S. to the custody of either parent was contrary to the welfare of M. S., and not in her best interest. The court then ordered both parents to pay child support in the amount of

15

$45.00 per week, set forth case plan requirements that the parents would need to satisfy before the court would consider returning custody, imposed supervised visitation, and awarded temporary custody of M. S. to the Whites. The mother timely appealed from this order.

> On appeal from an order finding a child to be a dependent child, we review the juvenile court's finding of dependency in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent. In making this determination we neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind that the juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened.

*In the Interest of R. D.*, 346 Ga. App. 257, 259 (1) (816 SE2d 132) (2018) (punctuation and footnote omitted). "[Under] Georgia law, clear and convincing evidence is an intermediate standard of proof which is greater than the preponderance of the evidence standard ordinarily employed in civil proceedings, but less than the reasonable doubt standard applicable in criminal proceedings." *In the Interest of K.*

16

*M.*, 344 Ga. App. 838, 847 (2) (811 SE2d 505) (2018) (citations and punctuation omitted).

"Under the most recent version of Georgia's Juvenile Code,[7] the juvenile court may place a minor child in the protective custody of the Department where the State shows, by clear and convincing evidence, that the child is a dependent child." *In the Interest of H. B.*, 346 Ga. App. 163, 164 (1) (816 SE2d 313) (2018) (citation, punctuation, and footnote omitted); see also OCGA § 15-11-180 (providing that the State bears "the burden of proving the allegations of a dependency petition by clear and convincing evidence"). Further, where as here, the child has already been removed from the parent's custody, "the correct inquiry for the juvenile court [is] whether the child[] would be [dependent] if returned to the parent's care and control as of the date of the hearing." *In the Interest of S. M.*, 321 Ga. App. 827, 831 (743 SE2d 497) (2013) (citation, punctuation, and emphasis omitted).

---

[7] Prior to the substantial revisions to the Juvenile Code in 2013, a juvenile court was authorized "to award custody to the Department of any minor child shown to be 'deprived.'" *In the Interest of S. C. S.*, 336 Ga. App. 236, 244, n.4 (784 SE2d 83) (2016). While the current version of the Juvenile Code uses the word "dependent" instead of "deprived," the definition of a "dependent child" and a "deprived child" are virtually the same. Compare OCGA § 15-11-2 (8) (2013) with OCGA §§ 15-11-2 (22), (48) (2014). Thus, "we find that our previous decisions addressing the deprivation of a child are relevant to appeals involving the dependency of a child." *In the Interest of S. C. S.*, 336 Ga. App. at 244, n.4.

"The Juvenile Code defines 'dependent child,' in relevant part, as a child who has been abused or neglected and is in need of the protection of the court." *In the Interest of H. B.*, 346 Ga. App. at 164 (1) (citation and punctuation omitted). "Abuse" is further defined as:

> (A) [a]ny nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child; (B) [e]motional abuse; (C) [s]exual abuse or sexual exploitation; (D) [p]renatal abuse; or (E) [t]he commission of an act of family violence as defined in Code Section 19-13-1 in the presence of a child. . . .

OCGA § 15-11-2 (2). "Neglect," in turn, is defined as: "(A) [t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals; [or] (B) [t]he failure to provide a child with adequate supervision necessary for such child's well-being. . . ." OCGA § 15-11-2 (48).

In determining whether a child is dependent, "[c]onsideration of past misconduct is appropriate because the juvenile court is not required to reunite a child with a parent in order to obtain current evidence of deprivation or neglect. Nevertheless, the record must contain evidence of present dependency, not merely

18

past or potential future dependency." *In the Interest of H. B.*, 346 Ga. App. at 165 (1) (citations and punctuation omitted).

> Notably, even a temporary loss of custody is not authorized unless there is clear and convincing evidence that the dependency resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child. Thus, only under compelling circumstances that are found to exist by such clear and convincing proof may a court sever, even temporarily, the parent-child custodial relationship. This is because the right to the custody and control of one's child is a fiercely guarded right in our society and in our law. Indeed, as our Supreme Court recently (and rightly) emphasized, the right of familial relations is among the inherent rights that are derived from the law of nature.

*In the Interest of T. Y.*, ___ Ga. App. ___, ___ (__ SE2d__) (Case No. A19A0226 decided June 18, 2019); see also *In the Interest of H. B.*, 346 Ga. App. at 165 (1) ("Moreover, a finding of parental unfitness is essential to support an adjudication of present dependency."). "Parental unfitness, like dependency, also must be proved by clear and convincing evidence." *In the Interest of H. B.*, 346 Ga. App. at 165 (1). To be clear, "the juvenile court's preference that custody of a child remain with someone other than her natural parents is wholly without consequence, where the court lacks

clear and convincing evidence to support that decision." *In the Interest of K. M.*, 344 Ga. App. at 847 (2) (citation and punctuation omitted). With these legal principles in mind, we turn to the case at hand.

In her sole enumeration of error, Flood argues that the juvenile court's determination that M. S. was presently dependent was not supported by clear and convincing evidence. Even construing the evidence in the light most favorable to the dependency determination, as we must on appeal, we agree with the mother that several pertinent findings in the juvenile court's order were not supported by clear and convincing evidence in the limited record before us. Accordingly, for the reasons that follow, we reverse.

As an initial matter, the record before us on appeal consists of 28 pages. The limited nature of the record has frustrated our ability to review the juvenile court's findings. For instance, although the juvenile court referenced Flood's "extensive history" with the Department as one of the facts underpinning its dependency determination, the record contains no evidence or testimony tending to establish any details regarding that history. Similarly, although the court referenced Flood's history of unstable housing and income instability, which are appropriate factors to consider in determining dependency, there was no evidence in the record with regard to these

20

matters. See *In the Interest of M. M.*, 315 Ga. App. 673, 676-678 (2) (727 SE2d 279) (2012) ( When established by clear and convincing evidence, a "[l]ack of stable housing and lack of support due to a parent's unstable or irregular employment are appropriate factors in determining [dependency].") (punctuation and footnote omitted). Likewise, although it was undisputed that Flood has other children in foster care (who were not at issue in this particular case), there was no evidence or testimony proffered regarding those children, the circumstances that led to the children's placement in foster care, or how long those children have been in foster care. Thus, to the extent the juvenile court based its dependency determination upon Flood's history with the Department, the court's order was not supported by clear and convincing evidence.

Next, as to the ongoing concerns regarding the cleanliness of Flood's apartment, the record established that those concerns related to Flood's prior residence from which she was evicted and from which M. S. was removed. The Department acknowledged at the dependency petition hearing that, since being evicted Flood had obtained a new residence, which met Department standards. Specifically, the Department's case manager testified that a walkthrough of the new apartment revealed that "[i]t was clean and furnished[, including a baby bed,] and had

some safety devices in place." Thus, the concerns regarding the cleanliness of Flood's old apartment had been remedied at the time of the hearing and could not serve as a basis for a finding of present dependency. *In the Interest of H. B.*, 346 Ga. App. at 165 (1) (while a court may consider past misconduct, "the record must contain evidence of present dependency, not merely past or potential future dependency") (citation and punctuation omitted); see also *In the Interest of M. M. R.*, 336 Ga. App. 14, 22-23 (1) (a) (783 SE2d 415) (2016) (physical precedent only) (holding in the context of a termination proceeding, that the juvenile court's present deprivation finding was not supported by clear and convincing evidence where the record established that the prior problematic living conditions and circumstances no longer existed and the grandmother had since "secured stable, suitable housing," which had been evaluated by authorities).

With regard to Flood's drug abuse (which the juvenile court concluded was the main cause of M. S.'s dependency), it is undisputed that the Department produced two positive hair follicle drug screenings from August 2018 and October 2018. However, the juvenile court found this evidence was controverted because Flood produced three negative hair follicle drug screenings from August, October, and November 2018. There was no testimony presented to explain the discrepancies in

22

these results nor were these results in the record. Similarly, there was no other testimony or evidence presented that tended to demonstrate that Flood had a present drug abuse issue. On the contrary, Flood denied any drug use, and Jeremy also denied any knowledge of drug use by Flood. Accordingly, and given the juvenile court's finding that the evidence concerning Flood's present drug use was controverted, the mother's present drug abuse was not established by clear and convincing evidence. See *In the Interest of K. M.*, 344 Ga. App. at 847 (2) ("clear and convincing evidence is an intermediate standard of proof which is greater than the preponderance of the evidence standard ordinarily employed in civil proceedings, but less than the reasonable doubt standard applicable in criminal proceedings") (citations and punctuation omitted); Cf. *In the Interest of A. B.*, 274 Ga. App. 230, 232 (617 SE2d 189) (2005) (in the context of termination, holding that clear and convincing evidence existed that the cause of the children's deprivation was likely to continue because the mother was highly likely to continue to use drugs, and had failed to achieve financial and residential stability based on evidence that the mother had abused cocaine for 20 years, had attempted rehabilitation several times but relapsed each time, had been in-and-out of jail on drug charges, and tested positive for cocaine six times in a two-year period).

With regard to the history of domestic violence between Flood and Jeremy, "[t]he commission of an act of family violence as defined in Code Section 19-13-1[8] in the presence of a child" can constitute "abuse" for purposes of the dependency statute. OCGA § 15-11-2 (2) (E). "[T]he term 'presence' means physically present or able to see or hear." Id. However, in this case there was no evidence that M. S. was ever present for, witnessed, or heard any of the alleged instances of domestic violence. Indeed, Flood testified that she always made sure that M. S. was not present during any of the altercations. Accordingly, the parents' history of domestic violence does not clearly and convincingly establish that M. S. is presently dependent. See *In the Interest of K. D.*, 344 Ga. App. 423, 427-428 (1) (810 SE2d 193) (2018) (reversing a determination of dependency as to the father where there was no evidence that any of the instances of family violence occurred in the presence of the children); *In the Interest of M. L. C.*, 249 Ga. App. 435, 439 (2) (548 SE2d 137) (2001) (holding that the trial court erred in finding the child deprived and in awarding temporary custody to the Department where the evidence showed that the parents had several violent altercations over the years, but there was no evidence that the child

---

[8] Family violence is defined, in relevant part, to include acts between "persons who are parents of the same child, parents and children . . . or other persons living or formerly living in the same household." OCGA § 19-13-1.

was present for the altercations or otherwise affected by them); *In the Interest of D. E. K.*, 236 Ga. App. 574, 577-578 (512 SE2d 690) (1999) (holding that the mother's relationship with an abusive husband, even when combined with other factors such as prior drug use and a nomadic lifestyle was not sufficient to render the child deprived so as to authorize temporary custody of the child to the Department).

Moreover, the record established that the domestic violence occurred when Flood and Jeremy lived together. However, both Flood and Jeremy testified that they no longer live together, and there was no testimony or other evidence showing any instances of domestic violence since they ceased living together. Although the juvenile court took issue with the fact that the parents now live next door to each other, remain friends, and might consider entering into a romantic relationship again in the future, those facts at most establish potential future dependency, not present dependency. *See In the Interest of H. B.*, 346 Ga. App. at 165 (1).

As part of its dependency determination, the juvenile court also relied on the fact that the paternal grandmother kept M. S. on numerous occasions, sometimes for several days at a time. However, given the facts of this case, this does not establish a basis for a finding of dependency. Specifically, the grandmother, Andrea, testified that she and her husband requested that they keep M. S. every weekend because it

25

was important to them that she attend church. She also testified that Flood would drop M. S. off on Fridays and pick her up on Mondays, which demonstrates that Flood was regularly involved in M. S.'s life. Although Andrea testified that there were instances where she kept M. S. for two to three weeks at a time, there was no explanation of how often this occurred or why. Further, there was no evidence or testimony presented that Flood left M. S. with the paternal grandparents because she could not provide for the needs of M. S. or otherwise care for the child. Thus, given the testimony at the hearing, there was no basis for the court to infer that M. S. was dependent as defined in OCGA § 15-11-2 (22), simply because M. S. frequently stayed with the grandparents.

The juvenile court also based its dependency determination on the fact that, if M. S. was returned to Flood's custody, Flood had no established plan for daycare, other than leaving M. S. with Flood's mother, who had not been approved by the Department and had a past history of alcohol abuse. However, Flood did not testify that her primary source of care for M. S. would be her mother. Rather, Flood testified that she intended to place M. S. in a daycare facility during her 1:00 to 10:00 pm shift, and only have Flood's mother watch M. S. for a couple of hours between when the daycare closed and Flood's shift ended. Furthermore, it appears that Flood was

not informed by the Department at any point prior to the hearing that her mother would not be a suitable caregiver, and thus, was not afforded a reasonable opportunity to come up with an alternative child care plan. Rather, the Department informed Flood on cross-examination that the Department would not approve her mother as a caregiver, and Flood pointed out that it had been over two years since the Department had evaluated Flood's mother and that her mother had quit drinking in the past few months. Regardless, Flood's lack of a complete child care plan merely establishes a speculative possibility that M. S. might be dependent in the future if returned to her custody, particularly when viewed in light of Flood's testimony that she had suitable housing (which the Department acknowledged) including a bed, food, and clothing for M. S.; a job; stable income; and that she could provide for M. S. without Jeremy's assistance. As set forth above, a dependency determination cannot be based solely on speculation that the child might be dependent in the future if returned to a parent's custody. See *In the Interest of H. B.*, 346 Ga. App. at 165 (1).

Accordingly, in light of the limited record in this case, we conclude that the juvenile court's dependency determination was not supported by clear and convincing evidence of present dependency. Consequently, we reverse.

*Judgment reversed. Dillard, P. J., and Hodges, J., concur.*

27