**FOURTH DIVISION**
**RICKMAN, C. J.,**
**DILLARD, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 16, 2023**

# In the Court of Appeals of Georgia

A23A0570. IN THE INTEREST OF K. R., a child.

DILLARD, Presiding Judge.

Candace Dorrough—K. R.'s adoptive mother—appeals the juvenile court's order finding K. R., a minor, dependent based on its determination that she was abused and neglected. Specifically, Dorrough argues the juvenile court erred by (1) failing to make a finding of parental unfitness; (2) finding there was clear and convincing evidence of present dependency; and (3) failing to make specific findings of fact. For the following reasons, we affirm.

Viewed in the light most favorable to the juvenile court's judgment,[1] the record shows that Dorrough and Brandon Rueter are the adoptive parents of K. R., who was eight years old during the relevant time period. On March 22, 2022, an investigator

---

[1] *See In the Interest of T. Y.*, 350 Ga. App. 553, 554 (829 SE2d 808) (2019).

with the Haralson County Sheriff's Office received a referral regarding K. R. and other children living in the home from a counselor at their school. The referral was based on allegations that K. R. "had a mark on her, . . . she was being physically punished with a wooden spoon, and . . . it was happening on more than one occasion." In response, Starr Bowling—the supervisor of the Division of Family and Children Services' ("DFCS") child protective services unit—went to speak with the children at their school.[2] Afterward, Bowling reported to the investigator that the children were "saying pretty much what they said to the [school] counselor." And according to Bowling, Dorrough and Rueter had been foster parents for over nine years, and there had been a "consistent pattern of abuse and neglect allegations" made against them.

After Bowling's visit to the school, the investigator arranged forensic interviews for each of the children living in Dorrough's home. And in the interviews, all of the children made disclosures about specific instances in which Dorrough, *inter alia*, hit K. R. regularly with a wooden spoon. As a result, based on these interviews, the investigator filed charges against Dorrough for first-degree cruelty to children,

---

[2] Dorrough does not claim this interview was conducted in violation of the Fourth Amendment, and so we are not called upon to consider that issue.

third-degree cruelty to children, and simple battery.[3] Some of the allegations underlying the first-degree cruelty to children charge were that Dorrough twisted K. R.'s arm behind her back, made her scream, hit her with the wooden spoon, and "yank[ed] [and] jerked [her] by the hair." The investigator testified that Dorrough was later charged with additional child-abuse offenses, but she did not specify which ones.

On April 29, 2022, after Dorrough was arrested, DFCS filed a petition for dependency as to Dorrough's two adopted children, K. R. and D. R.[4] According to DFCS, the children were subjected to abuse in the home while in the care of their parents. The juvenile court held a preliminary hearing, after which it found probable cause to show that both K. R. and D. R. were dependent as to Dorrough. And the juvenile court based its decision, in part, on Dorrough's failure to provide proper parental care and control and her arrest for child-abuse related charges. Even so, the court ruled that protective custody was unnecessary and allowed the children to

_____

[3] The victim at issue in the third-degree cruelty to children charge was one of the other children in the home, and this charge was based on that child observing Dorrough's physical abuse of K. R. But K. R. was the alleged victim as to the other charges.

[4] The juvenile court—in its *final* dependency order—did not find D. R. dependent as to either parent, and so he is not at issue in this appeal.

3

remain with Reuter while Dorrough was incarcerated. But the court also ordered that once Dorrough was released from incarceration, she could not reside in the family home. Lastly, the court ruled that Dorrough could have unsupervised visitation with D. R., but any contact she had with K. R. must be supervised by Dorrough's parents.

Approximately a month after the preliminary hearing, the juvenile court held a final dependency hearing.[5] Ultimately, following the hearing, the juvenile court entered a detailed order, finding K. R. dependent as to Dorrough—but not Reuter—because clear and convincing evidence showed that she abused or neglected K. R.[6] Despite finding K. R. dependent as to Dorrough, it ruled K. R. would remain in the home with *both* Dorrough and Rueter; but it imposed certain conditions and limitations for that arrangement, including that there could be no corporal punishment of the children. Lastly, the court ordered that if any condition of its order was

---

[5] Dorrough testified at the hearing, but presumably due to her pending criminal charges, she refused to answer the vast majority of DFCS's questions, and instead, asserted her Fifth Amendment right against self incrimination. *See* U.S. Const. Amend. V ("No person shall be compelled in any criminal case to be a witness against himself."); Ga. Const. of 1983, Art. I, Sec. I, Par. XVI ("No person shall be compelled to give testimony tending in any manner to be self-incriminating.").

[6] The juvenile court did not find D. R. dependent as to either parent at the final hearing.

4

violated, K. R. would be removed from the home and her parents might be held in contempt. This appeal by Dorrough follows.

When analyzing an appeal from an order finding a child dependent, we review the juvenile court's finding of dependency "in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent."[7] And in making this determination, we do not weigh the evidence or judge the credibility of witnesses, but instead "defer to the factual findings made by the juvenile court, bearing in mind that

---

[7] *In the Interest of La. K. et al.*, 353 Ga. App. 855, 857 (840 SE2d 76) (2020) (punctuation omitted); *accord In the Interest of R. D.*, 346 Ga. App. 257, 259 (1) (816 SE2d 132) (2018); *In the Interest of S. C. S.*, 336 Ga. App. 236, 244 (784 SE2d 83) (2016). The Juvenile Code was "substantially revised in 2013." *In the Interest of M. F.*, 298 Ga. 138, 140 (1) n.4 (780 SE2d 291) (2015). Importantly, the former Juvenile Code "authorized a juvenile court to award custody to the Department of any minor child shown to be 'deprived.'" *In the Interest of S. C. S.*, 336 Ga. App. at 244 n.4. But the current Juvenile Code, which applies in this case, "uses the word 'dependent' in lieu of 'deprived.'" *Id.*; *see* OCGA § 15-11-16 (a) (3) (providing that a proceeding under the new Juvenile Code "may be commenced . . . [b]y the filing of a complaint or a petition as provided in Article[ ] 3 ... of [the new Juvenile Code]," which governs dependency proceedings). Nevertheless, given the similarities between the definition of a "deprived child" and that of a "dependent child," we have found that "our previous decisions addressing the deprivation of a child are relevant to appeals involving the dependency of a child." *In the Interest of S. C. S.*, 336 Ga. App. at 244 n.4.

it must consider and protect the welfare of a child whose well-being is threatened,"[8] while also being mindful of the solemn obligation the judiciary has under both the federal and Georgia constitutions to—whenever possible—preserve the parent and child's fundamental right to familial relations.[9] Lastly, the party bringing the petition alleging dependency "carries the burden of proof, not the parent from whose custody the child will be removed."[10] With these guiding principles in mind, we turn now to Dorrough's specific claims of error.

---

[8] *In the interest of La. K. et al*, 353 Ga. App. at 857-58 (punctuation omitted); *accord In the Interest of T. Y.*, 350 Ga. App. at 558.

[9] *See In the Interest of La. K. et al*, 353 Ga. App. at 861 (840 SE2d 76) ("Notably, even a temporary loss of custody is not authorized unless there is clear and convincing evidence that the dependency resulted from unfitness on the part of the parent that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child. Thus, only under compelling circumstances that are found to exist by such clear and convincing proof may a court sever, even temporarily, the parent-child custodial relationship. This is because the right to the custody and control of one's child is a fiercely guarded right in our society and in our law. Indeed, as our Supreme Court recently emphasized, the right of familial relations is among the inherent rights that are derived from the law of nature.") (cleaned up); *accord In the Interest of T. Y.*, 350 Ga. App. at 559; *In the Interest of G. M.*, 347 Ga. App. 487, 490-91 (819 SE2d 909) (2018).

[10] *In the Interest of La. K. et al*, 353 Ga. App. at 862.

6

1. Dorrough argues the juvenile court erred by failing to make a finding of parental unfitness, which is required in an adjudication of dependency. We disagree.

Dorrough is correct that "parental unfitness is essential to support an adjudication of dependency."[11] But Georgia law, as it currently stands, does not appear to explicitly require a finding of parental unfitness when, as here, the child is *not* removed from the parent's custody. To be sure, we have repeatedly held that "[a] juvenile court is not authorized to *remove a child from a parent*, even temporarily, unless clear and convincing evidence exists that the dependency resulted from unfitness on the part of the parent . . . ."[12] And in other cases, we have indicated that a child may be dependent without a finding of parental unfitness *if* that child remains in the custody of the parent at issue. Specifically, we have held that "[e]ven *after* finding a child to be dependent, a juvenile court *can only remove* a child from a

---

[11] *In the Interest of V. G.*, 352 Ga. App. 404, 406 (1) (834 SE2d 901) (2019) (punctuation omitted); *accord In the Interest of H. B.*, 346 Ga. App. 163, 165 (1) (816 SE2d 313) (2018).

[12] *In the Interest of A. M. B.*, 361 Ga. App. 551, 557 (b) (864 SE2d 713) (2021) (punctuation omitted & emphasis supplied); *accord In the Interest of V. G.*, 352 Ga. App. at 412 (1) (b); *see In the Interest of K. et al*, 353 Ga. App. at 861 (explaining, in relevant part, that "even a temporary *loss of custody* is not authorized unless there is clear and convincing evidence that the dependency resulted from unfitness on the part of the parent that is . . . either intentional or unintentional misconduct resulting in the abuse or neglect of the child . . ." (punctuation omitted & emphasis supplied)).

parent's custody *if* it finds that the dependency resulted from unfitness on the part of the parent . . . ."[13]

Regardless, as explained in Division 2 (a) *infra*, under the circumstances of this case, a finding of parental unfitness and dependency is established through the *same* evidence of abuse and neglect as defined in OCGA § 15-11-2.[14] And importantly, although the juvenile court did actually not use the words "unfit" or "parental unfitness" in its written order, "[w]hen reviewing [a] juvenile court's order, we are mindful that [such] orders are construed according to their substance and function and not merely by nomenclature."[15]

---

[13] *See In the Interest of A. B.*, 350 Ga. App. 158, 159 (1) (828 SE2d 394) (2019) (punctuation omitted & emphasis supplied); *accord In the Interest of K. K.*, 364 Ga. App. 82, 83 (874 SE2d 110) (2022); *In the Interest of T. S.*, 348 Ga. App. 263, 269 (820 SE2d 773) (2018).

[14] *See* OCGA § 15-11-2 (2) (A)-(E) (providing the statutory definition of "abuse" that applies in the context of dependency proceedings); OCGA § 15-11-2 (48) (providing the statutory definition of "neglect" that applies in dependency proceedings). In Division 2 *infra*, the statutory definitions of "abuse" and "neglect" are discussed in greater detail. Additionally, we explain why rulings on dependency and parental unfitness—in the context of this case—require the same evidence of abuse and neglect. *See infra* notes 30 & 35.

[15] *In the Interest of M. F.*, 345 Ga. App. 550, 552 (1) (813 SE2d 786) (2018) (punctuation omitted) (physical precedent only); *see Forest City Gun Club v. Chatham Cty.*, 280 Ga. App. 219, 220 (633 SE2d 623) (2006) ("[P]leadings, motions, and *orders* are construed according to their substance and function and not merely by

Here, in her one-paragraph argument, Dorrough summarily contends the juvenile court's order contained "no findings whatsoever with regard to parental unfitness . . . ." But this claim is belied by the record. Indeed, the juvenile court's order provides detailed factual findings regarding Dorrough's abuse and neglect of K. R.: (1) Dorrough spanked K. R. with a "big wooden spoon" on a regular basis, and the other children heard K. R. "crying and yelling"; (2) K. R. was the only child in the home who Dorrough spanked; (3) on one occasion, Dorrough hit K. R. with the spoon so hard she fell out of her bed and the other children heard her "screaming";[16] (4) two of the children in the home witnessed Dorrough pulling K. R.'s hair; (5) Dorrough would often tell K. R. "she was ugly, her clothes were nasty, . . . she stunk[,]" and her hair was "nappy"; (6) Dorrough yelled, screamed, and became erratic during K. R.'s

nomenclature." (emphasis supplied)). *Cf. In the Interest of L. R. M.*, 333 Ga. App. 1, 3 (1) (775 SE2d 254) (2015) (explaining, in the context of a deprivation proceeding, "[p]leadings and motions . . . are construed according to their substance and function and not merely by nomenclature").

[16] Suffice it to say, there is significant distinction between a parent physically abusing his or her child (as was the case here), and a parent choosing to discipline his or her child by means of reasonable and nonexcessive corporal punishment. The former is impermissible, whereas the latter amounts to constitutionally protected conduct. *See, e.g., Doe v. Heck*, 327 F3d 492, 522 (7th Cir. 2003) (Manion, J.) (holding that "the fundamental right of parents to direct the upbringing of their children necessarily includes the right to discipline them"); *accord In re T.S.*, 310 Ga. App. 100, 103 n.8 (712 SE2d 121) (2011).

therapy sessions; and in one session, she flew into a "rage" with K. R. sitting next to her; (7) Dorrough was criminally charged with child-abuse offenses based on the investigation into her physical abuse of K. R. in *this* case; (8) Bowling testified that, since Rueter and Dorrough began fostering children in 2014, there have been seven to nine DFCS investigations involving the family; and (9) the court-appointed special advocate ("CASA") recommended K. R. be found dependent in a detailed report.[17] Given the foregoing, Dorrough's claim the court made no factual findings that, in substance, relate to both a dependency determination and a finding of parental unfitness strains credulity.[18]

2. Dorrough also contends the juvenile court erred in finding that clear and convincing evidence supported its determination that K. R. was dependent. Again, we disagree.

---

[17] Whether these factual findings and others made by the juvenile court were supported by the record and sufficient to support its dependency ruling is addressed specifically in Division 2 *infra.* But in this Division, we address only whether the juvenile court *made written factual findings* to support its dependency ruling.

[18] *See In the Interest of S. C.* S., 336 Ga. App. at 248-49 (2)-(3) (relying on much of the same evidence of abuse to affirm both juvenile court's findings that the mother was unfit due to abuse and the child was also dependent because of same); OCGA § 15-11-2 (2), (48) (providing definitions for "abuse" and "neglect" applicable in all aspects of a dependency proceeding).

Under OCGA § 15-11-2 (22), a "dependent child" is defined as a child who "[h]as been *abused or neglected* and is in need of the protection of the court . . . ."[19] And as previously explained, "parental unfitness" is essential to supporting an "adjudication of dependency."[20] Importantly, "'[u]nfitness' . . . refers to intentional or unintentional misconduct resulting in the *abuse or neglect* of the child . . . ."[21] So, in making its determination as to dependency, "a juvenile court *may* consider evidence of past conduct, but the record must contain evidence of present dependency, not merely past or potential future dependency."[22] And as with

---

[19] (Emphasis supplied.).

[20] *In the Interest of V. G.*, 352 Ga. App. at 406 (1) (punctuation omitted); *accord In the Interest of H. B.*, 346 Ga. App. at 165 (1).

[21] *In the Interest of H. B.*, 346 Ga. App. at 165 (1) (punctuation omitted & emphasis supplied); *see In the Interest of T. Y.*, 350 Ga. App. at 559 (noting that "even a temporary loss of custody is not authorized unless there is clear and convincing evidence that the dependency resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child" (punctuation)).

[22] *In the Interest of A. M. B.*, 361 Ga. App. at 555 (a) (emphasis supplied); *see In the Interest of T. Y.*, 350 Ga. App. at 560 (1) ("[C]onsideration of past misconduct is appropriate because the juvenile court is not required to reunite a child with a parent in order to obtain current evidence of deprivation or neglect. But the record must contain evidence of present dependency, not merely past or potential future dependency." (punctuation & footnote omitted)).

11

dependency determinations, "[p]roof of parental unfitness must . . . be by clear and convincing evidence."[23] Needless to say, this constitutionally mandated standard of review "safeguards the high value society places on the integrity of the family unit"—*i.e.*, the private realm of family life[24]—and "helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior."[25]

(a) *Physical Abuse*. Dorrough claims there was not clear and convincing evidence to support the juvenile court's dependency ruling. And as to physical abuse, she argues "[t]here is a complete and utter absence of any testimony or evidence" that K. R. suffered "any physical injuries or physical injuries which are inconsistent with

---

[23] *In the Interest of V. G.*, 352 Ga. App. at 407 (1) (punctuation omitted); *see In the Interest of H. B.*, 346 Ga. App. at 165 (1) ("Parental unfitness, like dependency, also must be proved by clear and convincing evidence.").

[24] *See Prince v. Massachusetts*, 321 U. S. 158, 166 (64 SCt 438, 88 LEd 645) (1944) (noting that there is a "private realm of family life which the state cannot enter"); *Dept. of Human Servs. v. Duncan*, 351 Ga. App. 332, 339 n. 1 (831 SE2d 4) (2019) (Dillard, P.J., concurring fully and specially) (noting that "[t]he family has rightly been characterized as the first and vital cell of society" (citation and punctuation omitted)); *see also* Richard W. Garnett, *Taking Pierce Seriously: The Family, Religious Education, and Harm to Children*, 76 NOTRE DAME LAW REV. 109, 114 (I) (2000).

[25] *In the Interest of V. G.*, 352 Ga. App. at 407 (1) (punctuation omitted); *accord In the Interest of C. D. E.*, 248 Ga. App. 756, 761 (1) (546 SE2d 837) (2001).

the explanation given for them suffered by [K. R.] as a result of the acts or omission of [Dorrough] . . . ."

In this regard, under OCGA § 15-11-2 (2) (A), "[a]buse" means, in relevant part, "[a]ny nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child . . . ." And in claiming there was *no* evidence of physical abuse, Dorrough first relies on the investigator's testimony that the only evidence of physical abuse discovered during her investigation was that a DFCS worker saw a bruise on K. R.'s back. But while the investigator certainly provided such testimony, evidence that someone saw a bruise on K. R.'s back *is* evidence of physical abuse. Furthermore, the investigator's other testimony contradicts her claim that the bruise was the *only* evidence of physical abuse in this case. Indeed, the investigator testified that she received reports that Dorrough repeatedly twisted K. R.'s arm behind her back, made her scream, struck her forcefully with a wooden spoon, and yanked and jerked her by the hair. And significantly, the investigator ultimately charged Dorrough criminally with child-abuse offenses based on evidence that she physically abused K. R.

13

At the conclusion of her argument regarding physical abuse, Dorrough contends, in passing, that Bowling testified there was a "complete lack" of evidence of physical abuse because she believed this was more of an emotional-abuse situation. But her opinion that there was *more* evidence of emotional abuse than physical abuse does not mean there was *no* evidence of physical abuse. To the contrary, Bowling testified that her investigation involved allegations K. R. "had a mark on her"and was being "*physically* [and unreasonably and excessively] punished with a wooden spoon" on more than one occasion.[26] Regardless, to the extent the testimony cited by Dorrough is inconsistent with other evidence regarding the alleged physical abuse K. R. suffered, the juvenile court—as the factfinder—was entitled to credit certain testimony and evidence over others.[27]

But even if we were to discount the testimony cited by Dorrough, there was ample evidence that she physically abused K. R. Specifically, DFCS submitted

[26] (Emphasis supplied).

[27] *See In the Interest of C. S.*, 354 Ga. App. 133, 138 (1) (840 SE2d 475) (2020) ("[T]he juvenile court evidently did not find [certain] testimony credible, and we will not second guess the court's credibility determinations."); *In the Interest D. D. B.*, 282 Ga. App. 416, 418 (1) (638 SE2d 843) (2006) ("[I]n considering past deprivations compared to present achievements, juvenile courts are entitled to assign "much less weight to such 'assertions of sudden parental fitness' when compared to the other evidence." (punctuation omitted)).

14

summaries of forensic interviews with all five children living in the home with Dorrough and K. R. The investigator observed those interviews and described the children's reports as "very consistent" regarding Dorrough's treatment of K. R. In her interview, K. R.—who was eight years old at the time—disclosed that Dorrough often struck her hard with a large wooden spoon on her "bottom back leg area" and it "hurt." K. R. also reported that Dorrough sometimes grabbed her by the hair to "pull [her] where [Dorrough] want[ed] her to be." And D. R.—who was five years old at the time—testified that K. R. was the only child in the home who got spankings, and Dorrough spanked her with a wooden spoon, which made her cry.

K. L.—who was ten years old at the time—also testified that Dorrough hit K. R. with a wooden spoon, and once, Dorrough pulled K. R. off of her bed while doing so, causing her to hit her "back on the bed rail and her head on the vanity." And according to K. L., Dorrough did not treat any of the other children in the home the way she treated K. R. Additionally, in a supplement to the police report, the investigator noted that K. L. also disclosed that after K. R. took some candy, Dorrough no longer allowed her in the house. Specifically, Dorrough only permitted K. R. in the house to use the bathroom, get a glass of water, eat, and go to bed. If K. R. was not doing one of those things, Dorrough made her stay outside. K. L. believed

15

K. R. did not report Dorrough's abusive actions because she was afraid of being moved to a home where the parents were "even meaner."

In his forensic interview, N. R.—who was ten years old at the time—testified that Dorrough struck K. R. with a wooden spoon so hard that—even though it happened inside on the second floor of the home—he could hear K. R. scream from the back yard. N. R. believed Dorrough was racist and repeatedly hit K. R. because she was black, and he was afraid of Dorrough. In addition, Da. R.—who was 13 years old at the time—testified that when Dorrough hit K. R., he could hear her screaming and crying. Da. R. also disclosed that Dorrough called K. R.'s hair nappy, pulled it while brushing it, and brushed K. R.'s hair so hard that "clumps of hair came out." Finally, Da. R. reported that Dorrough yelled at K. R. more than the other children, and he believed Dorrough was scared that if she "put her hands on any of the foster kids," she would go to jail.

At the dependency hearing, Darleen Wodzenski—a clinical mental health counselor who worked with K. R., her parents, and some of the other children in 2020 and 2021—testified that there were many challenges in attempting to stabilize K. R. and regulate her behavior. As to Dorrough, Wodzenski was "deeply concerned" about her "irrational anger" and "inability to self-regulate." Indeed, in Wodzenski's

interactions with Dorrough, she would "fly into a rage" and "scream[ ]" and "holler[ ]" at her. And when Dorrough did so, K. R. was "literally quivering and shaking." In addition to "the inappropriate, excessive, quick[-]to[-]anger" behavior, Dorrough also made deprecating comments about K. R. during their sessions.

Following the hearing, the CASA submitted a "best interest statement regarding adjudication" to the court at its request. According to the CASA, each child residing in K. R.'s home witnessed her being "harshly disciplined." The children all perceived K. R. as being "targeted" by Dorrough, as she was often alienated outside of the home, and by most accounts, was the only child subjected to this type of punishment. The CASA believed the excessive *physical* punishment took an emotional toll on K. R., as well as the other children in the home. And while the CASA rightly acknowledged that corporal punishment is a constitutionally protected form of discipline, she reported that the "constant hitting of [K. R.] was excessive [and unreasonable]." The CASA was also understandably concerned that, prior to this case, there had been approximately seven to nine DFCS investigations involving Dorrough and Rueter. Ultimately, the CASA recommended that K. R. be found dependent and that her parents be subjected to a court-ordered case plan.

Lastly, an attorney for the children wrote a letter to the court, which he described as his "closing arguments" in the case. As with other witnesses, the attorney emphasized that all the children in the home testified consistently that K. R. "received weekly physical punishment on a regular basis with a wooden spoon and was grabbed by her hair and her arm." The attorney noted that "[n]o corresponding bruises were found," but he believed "such *frequent painful physical incidents* must be confronted."[28] And while the attorney noted that corporal punishment is legally allowed, he believed it should be "forbidden" in K. R.'s home due to the frequent, excessive, and unreasonable nature of these incidents. Ultimately, the attorney reported there were "too many red flags going up in [the] household" and concluded that K. R. was in dire need of the protection and supervision of the court.

To summarize, DFCS presented evidence that, *inter alia*, Dorrough hit K. R. regularly and excessively with a wooden spoon; she once hit K. R. so hard she fell off of the bed, hitting her back on the bed rail and her head on the vanity; sometimes when Dorrough hit K. R., the other children could hear her screams outside; Dorrough isolated K. R. outside of the house unless she needed to drink water, go to the bathroom, or sleep merely because she took some candy; Dorrough and Reuter

---

[28] (Emphasis supplied.).

had been investigated by DFCS approximately seven to nine times before this case; and as to her physical abuse of K. R. in *this* case, Dorrough was charged with multiple child-abuse related offenses. Under such circumstances and viewing the evidence in a light most favorable to the juvenile court's ruling, clear and convincing evidence supported its ruling finding K. R. dependent as to Dorrough based on physical abuse.[29]

---

[29] *See In the Interest of R. D.*, 346 Ga. App. at 259-62 (1) (holding that, viewed in the proper light on appeal, clear and convincing evidence supported the juvenile court's ruling that children were dependent when, *inter alia*, the parent banged one of their heads against a wall, had a history of involvement with DFCS; regularly disciplined the younger children by striking them with a hand or belt so hard it left visible marks; frequently hit the children's heads and slapped their lips; and continued her physically abusive conduct even after her prior involvement DFCS); *Id.* at 259-60 (citing the mother's past involvement with DFCS as *some* evidence supporting the juvenile court's ruling that child was dependent due to emotional and physical abuse); *In the Interest of T. A. H.*, 310 Ga. App. 93, 95-96 (1) (712 SE2d 115) (2011) (finding that a prior unappealed order finding children deprived supported a finding of deprivation in this subsequent case); *In the Interest of M. K.*, 288 Ga. App. 71, 72-73 (1) (653 SE2d 354) (2007) (affirming the juvenile court's ruling that a child was deprived due to physical abuse when, *inter alia*, the child testified that her mother "hit her [excessively] on a regular basis"); *In the Interest of J. B. M.*, 284 Ga. App. 480, 484-85 (1) (644 SE2d 317) (2007) (affirming the juvenile court's ruling, finding children deprived when, *inter alia*, the parent was facing criminal charges related to the physical abuse of her children). *Cf. In the Interest of C. L. Z.*, 283 Ga. App. 247, 248-49 (641 SE2d 243) (2007) (reversing a juvenile court's finding that a child was deprived as to her grandmother when there was evidence only of a single, isolated incident in which the grandmother "put her hand on the back of [the child's] head and 'forcefully' pushed her, face first, into the side panel of the vehicle").

(b) *Emotional Abuse.* Dorrough also claims there was insufficient evidence to establish K. R. suffered emotional abuse. But other than citing the statutory definition of such abuse,[30] she provides no legal authority or argument to support this claim, much less apply it to the specific facts of this case. Instead, she cites two short excerpts from Bowling and Wodzenski's testimony and summarily concludes it was insufficient to establish K. R. suffered emotional abuse. In this regard, we have held that an argument is abandoned if it provides general citations to the "most basic legal authority" without providing any legal authority or argument related to the specific

---

[30] *See* OCGA § 15-11-2 (30) ("'Emotional abuse' means acts or omissions by a person responsible for the care of a child that cause any mental injury to such child's intellectual or psychological capacity as evidenced by an observable and significant impairment in such child's ability to function within a child's normal range of performance and behavior or that create a substantial risk of impairment, if the impairment or substantial risk of impairment is diagnosed and confirmed by a licensed mental health professional or physician qualified to render such diagnosis.").

facts of her case.[31] Under these circumstances, then, Dorrough abandoned her claim that there was insufficient evidence to establish K. R. suffered emotional abuse.[32]

Further, even if Dorrough had not abandoned this claim, we need not address whether there was clear and convincing evidence that K. R. suffered physical abuse *and* emotional abuse to support the juvenile court's dependency ruling. Indeed, OCGA § 15-11-2 provides that "abuse" in this context, means "[a]ny nonaccidental physical injury or physical injury which is inconsistent with the explanation given for it suffered by a child as the result of the acts or omissions of a person responsible for the care of a child *[or]* . . . [e]motional abuse . . . ."[33] And importantly, because

---

[31] *See Gunn v. State*, 342 Ga. App. 615, 623-24 (3) (804 SE2d 118) (2017) (holding that the appellant abandoned two claims of error when, beyond one or two case citations to "the most basic legal authority" as to the purpose of the legal rule at issue and the general standard applicable to claims of ineffective assistance of counsel, the appellant provided no legal authority to support his *specific* contentions as to how and why the trial court committed error, and noting that "mere conclusory statements are not the type of meaningful argument contemplated by our rules" (punctuation omitted)); *Dixon v. Metro. Atlanta Rapid Transit Auth*., 242 Ga. App. 262, 266 (4) (529 SE2d 398) (2000) ("Rhetoric is not a substitute for cogent legal analysis, which is, at a minimum, a discussion of *the appropriate law as applied to the relevant facts*." (emphasis supplied)).

[32] *See* Ct. App. R. 25 (d) (1) (i) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned.").

[33] OCGA § 15-11-2 (2) (A)-(B) (emphasis supplied).

21

physical and emotional abuse are listed disjunctively, clear and convincing evidence

of *both* is not necessary.[34] So, because we have already determined there was clear

and convincing evidence of physical abuse to support the juvenile court's dependency

ruling, we need not consider whether there was *also* such evidence of emotional

abuse.

(c) *Neglect.* Next, Dorrough argues there was insufficient evidence to establish

K. R. suffered neglect within the meaning of OCGA § 15-11-2 (48). But again, aside

from citing the statutory definition of neglect,[35] Dorrough provides no legal authority

---

[34] *See Haugen v. Henry Cty.* 277 Ga. 743, 744-45 (2) (594 SE2d 324) (2004) ("The natural meaning of 'or,' where used as a connective, is to mark an alternative and present choice, implying an election to do one of two things." (punctuation omitted)); *Gearinger v. Lee*, 266 Ga. 167, 169 (2) (465 SE2d 440) (1996) ("[W]here a legislative provision is phrased in the disjunctive, it must be so construed absent a clear indication that a disjunctive construction is contrary to the [codified] legislative intent."); *Tyler v. State*, 247 Ga. 119, 124 (3) (274 SE2d 549) (1981) ("It is not required that the trier of fact find the existence of each disjunctive phrase of the statute. It must be shown simply that the evidence is sufficient to satisfy the first major component of the statutory aggravating circumstance and at least one sub-part of the second component, as hereinafter set forth." (punctuation omitted)).

[35] *See* OCGA 15-11-2 (48) (defining "neglect" as "(A) The failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals; (B) The failure to provide a child with adequate supervision necessary for such child's well-being; or (C) The abandonment of a child by his or her parent, guardian, or legal custodian." Subsection A is the only one at issue in this appeal.

or any discussion of such authority as it applies to the facts of *this* case. Instead, she summarily contends DFCS failed to provide any evidence of neglect. As a result, she has also abandoned this claim of error.[36] Regardless, under OCGA § 15-11-2 (22), a "dependent child" is defined, in relevant part, as a child who "[h]as been abused *or* neglected and is in need of the protection of the court . . . ."[37] And because abuse and neglect are listed disjunctively, clear and convincing evidence of *both* is not required to support the juvenile court's dependency finding.[38] Moreover, since we have already concluded there was clear and convincing evidence Dorrough physically abused K. R. within the meaning of OCGA § 15-11-2, we need not address whether clear and convincing evidence showed that Dorrough neglected K. R.

3. Finally, Dorrough contends the juvenile court erred by failing to make specific findings of fact, and instead, "merely [gave] a recitation of events that took

---

[36] *See supra* notes 31-32 & accompanying text.

[37] (Emphasis supplied.).

[38] *See supra* note 34.

place at the trial" in violation of OCGA § 9-11-52 (a).[39] This claim is likewise without merit.

Dorrough is correct that—in a dependency case—the juvenile court's order must contain findings of fact to support its decision.[40] But as detailed in Division 1 *supra*, the juvenile court made *extensive* findings of fact regarding Dorrough's physical and emotional abuse of K. R. and then expressly stated that its dependency ruling was based on those findings. This claim of error, then, is belied by the record.

For all these reasons, we affirm the juvenile court's order finding K. R. dependent as to Dorrough.

*Judgment affirmed. Rickman, C. J., and Pipkin J., concur*.

---

[39] *See* OCGA § 9-11-52 (a) ("In ruling on interlocutory injunctions and in all nonjury trials in courts of record, the court shall upon request of any party made prior to such ruling, find the facts specially and shall state separately its conclusions of law. If an opinion or memorandum of decision is filed, it will be sufficient if the findings and conclusions appear therein. Findings shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").

[40] *See* OCGA § 15-11-111 (b) (2) (providing that "[a]t any hearing held with respect to a child, the court in its discretion, and based upon the evidence, may enter an order . . . [and that order] [s]hall include findings of fact which reflect the court's consideration of the oral and written testimony offered by all parties . . .").

24